STATE EX REL. CITY OF BILLINGS, APPELLANT, *v.* BILL-INGS GAS CO., RESPONDENT.

(No. 4,033.)

(Submitted June 13, 1918. Decided June 24, 1918.)

[173 Pac. 799.]

*Cities and Towns—Powers—Gas Franchise—Rates—Regulation —Public Utilities Commission—Statutory Construction—Constitution.*

Cities and Towns—Gas—"Franchise."
  1.  The right granted to a company under ordinance to use streets for laying mains and supplying inhabitants with gas is a "franchise."

Same—Acceptance of Franchise—Effect.
  2.  Acceptance of a franchise which contains terms constitutes a contract between a city and a gas company if the city had authority to make such contract.

Same—Public Utility Rates—Right to Fix.
  3.  There is a well-defined distinction between authority of a city to regulate public utility rates from time to time, and authority to fix rates by contract for a definite period.

Same—Public Utility Rates—Right to Alter.
  4.  Where a city has entered into a binding contract with a public utility, fixing rates for a definite period, it surrenders for the duration of the contract its governmental function of rate regulation so far as altering contract rates is concerned.

---

On power of municipality to fix gas rates as an incident of its power to authorize the laying of gas-mains, see note in 18 L. R. A. (n. s.) 1197.

For authorities discussing the question of power of municipality apart from contract to regulate the rates to be charged by public service corporations, see notes in 33 L. R. A. (n. s.) 759 and 43 L. R. A. (n. s.) 995.

Same—Powers—How Determined.

5. A city has only such authority as is conferred upon it by express legislative declaration, or by necessary implication, and any doubt as to the existence of a particular power will be resolved against a city, and right to exercise such power denied.

Same—Powers—Burden of Proof.

6. Since a city exercises only limited delegated authority, anyone claiming the benefit of a city's act has the burden of showing that it acted within the scope of its authority.

Same—Gas—Granting Franchise—Approval of Electors.

7. A city cannot grant a franchise for supplying inhabitants with illuminating gas until the application for it has first been submitted to and approved by its qualified electors.

Same—Franchise Contract—Unreasonable Terms—Effect.

8. A city cannot bind its inhabitants by a contract unreasonable in its terms.

Same—Public Utility Rates—Regulation—Presumptions.

9. Rate regulation of public utilities is a legislative function of the state, and since the effect of a grant to a city to enter into a contract with a public utility for specific rates for a given period is to extinguish *pro tanto* a governmental power of first importance, the courts will not indulge the presumption that such a surrender of power has been made, but the legislative intention must be expressed in clear and unmistakable language or necessarily implied from the powers expressly granted, before it can be held that the state has precluded itself from the function of rate regulation and control.

Same—Public Utility Rates—State Regulation.

10. Under section 3,259, subdivisions 63 and 73, Revised Codes, a city may contract for rates with a public utility, subject, however, to the paramount authority of the state (see par. 9 above) to exercise its power in the premises whenever it chooses to do so.

Same—Regulation of Gas Rates—Constitution—Impairing Obligation of Contracts.

11. Inasmuch as a franchise contract made in 1912 between a city and a gas company must be presumed to have been entered into with knowledge that the state could thereafter enact legislation toward exercising the power of rate regulation reposed in it, and thus change the rates fixed by the contract (see paragraphs 9 and 10 above), Chapter 52, Laws of 1913, creating a public utility commission with power to regulate rates, *etc.*, is not open to attack on the ground that it impairs the obligation of the contract made the year before.

Same—Regulation of Rates—Statutory Construction.

12. *Held,* that the concluding sentence of section 12 of the Act of 1913, to-wit: "This, however does not have the effect of suspending, rescinding, invalidating or in any way affecting existing contracts," refers to the sentence immediately preceding—which forbids rebates, concessions, *etc.* and was not intended to except from the operation of the Act rate contracts made between cities and public utilities prior to its passage.

Same—Gas Rates—Filing With Utilities Commission—Effect.

13. The rates required by section 11 of the Act establishing the Public Utilities Commission (Chap. 52, Act of 1913) to be filed by public utilities with the commission as in force at the time of filing, become the legal rates without affirmative action by the commis-

sion, and remain so until changed in the manner provided by the Act.

[As to the validity of statute conferring upon public service commission power to fix rates for public service corporations, see note in Ann. Cas. 1917C, 57.]

*Appeal from District Court, Yellowstone County; A. C. Spencer, Judge.*

ACTION by the State, on the relation of the City of Billings, against the Billings Gas Company. Judgment for defendant, and the city appeals. Affirmed.

*Mr. Thad. S. Smith* and *Mr. J. H. Johnston,* for Appellant, submitted a brief; *Mr. Johnston* argued the cause orally.

The Billings Gas Company, under its own theory of the case, by virtue of the contract with the city of Billings, has been accorded valuable rights, concessions and privileges, and in consideration thereof but one obligation or duty is imposed upon the company, namely, to furnish gas to the city of Billings and its inhabitants, in accordance with the stipulations of the contract. "Where a municipality grants the right to use streets for gas-pipes, it may provide that the charge for gas furnished the city and its inhabitants shall not exceed certain prices, without regard to whether the municipality has the power to regulate the rates of the company." (McQuillin on Municipal Corporations, secs. 1644, 1738; *Helena Light & Ry. Co.* v. *City of Helena,* 47 Mont. 18, 130 Pac. 446; *Vicksburg* v. *Vicksburg Water Works,* 206 U. S. 496, 51 L. Ed. 1155, 27 Sup. Ct. Rep. 762; 12 R. C. L. 878.) Mr. Thompson recognizes the principle for which we contend, and concedes that the public utility company waives its right to object to an ordinance when it accepts the same. (3 Thompson on Corporations, p. 883; 12 R. C. L. sec. 38; *Illinois Trust & Sav. Bank* v. *Arkansas City,* 76 Fed. 271, 34 L. R. A. 518, 22 C. C. A. 171; *State* v. *City of Great Falls,* 19 Mont. 518, 49 Pac. 15; *Cleveland* v. *Cleveland City R. R. Co.,* 194 U. S. 517, 48 L. Ed. 1102, 24 Sup. Ct. Rep. 756; Pond on Public Utilities, sec. 5.)

It is elementary that the city itself would be estopped to repudiate the terms of this contract.   (28 Cyc. 1044.) So the doctrine of estoppel has often been applied when the question of the validity of an ordinance has been raised.   Thus, a railroad corporation which accepts the benefit of an ordinance will be estopped from thereafter denying its validity.   (McQuillin on Municipal Corporations, sec. 797; *St. Mary's* v. *Hope Natural Gas Co.*, 71 W. Va. 76, 43 L. R. A. (n. s.) 994, 76 S. E. 841.)

*Messrs. Nichols & Wilson*, for Respondent, submitted a brief; *Mr. Harry Wilson* argued the cause orally.

Our contention is that the state of Montana having expressly reserved in itself the right to fix rates of the character under discussion, the city has no authority to fix, control or regulate them either by ordinance or contract.   Had it been intended to vest in cities the power to regulate gas, water or electric light rates, such power would have been expressly delegated. Not having been so delegated, either expressly or by necessary implication, it follows that the city does not possess this power, and certainly a power which it does not possess at all cannot be exercised by contract any more than it can by ordinance. (Smith on Municipal Corporations, sec. 726; McQuillin on Municipal Corporations, p. 3718; *Home Tel. & Tel. Co.* v. *Los Angeles*, 211 U. S. 265, 53 L. Ed. 176, 29 Sup. Ct. Rep. 50.) Counsel argue that even if the authority of the city to make the contract in this case was wanting in the first instance, the defendant company is now precluded from raising that question after having accepted the franchise and enjoyed the benefits thereof.   This argument is not supported either by reason or authority.   If it was without the power of the city to make the contract, it is equally without its power to enforce it. (*Central Trans. Co.* v. *Pullman's Palace Car Co.*, 139 U. S. 24, 35 L. Ed. 55, 11 Sup. Ct. Rep. 478; *Board of Commrs.* v. *Lafayette etc. R. R. Co.*, 50 Ind. 85.)

The exercise of the police power of a state cannot be limited by contract for reasons of public policy, and it is immaterial upon what consideration the contract rests, as it is beyond the power of the state or the municipality to abrogate this power so necessary to the public welfare. (*Northern Pac. Ry. Co.* v. *Minnesota*, 208 U. S. 583, 52 L. Ed. 630, 28 Sup. Ct. Rep. 341; *C. B. & Q. Ry. Co.* v. *Nebraska*, 170 U. S. 57, 42 L. Ed. 948, 18 Sup. Ct. Rep. 513; *Boston Beer Co.* v. *Massachusetts*, 97 U. S. 25, 24 L. Ed. 989; *Northwestern Fertilizing Co.* v. *Hyde Park*, 97 U. S. 659, 24 L. Ed. 1136; *New Orleans Gas Light Co.* v. *Louisiana L. & H. P. Co.*, 115 U. S. 650, 29 L. Ed. 516, 6 Sup. Ct. Rep. 252; *Mugler* v. *Kansas*, 123 U. S. 623, 31 L. Ed. 205, 8 Sup. Ct. Rep. 273; *Budd* v. *New York*, 143 U. S. 517, 36 L. Ed. 247, 12 Sup. Ct. Rep. 468.) No unconstitutional impairment of contract results so far as the city is concerned from a change by the state of rates fixed by a franchise granted by the municipality to a telephone company, if the municipal charter is subject to the general laws of the state. (*State ex rel. Webster* v. *Superior Court*, 67 Wash. 37, Ann. Cas. 1913D, 78, L. R. A. 1915C, 287, 120 Pac. 861.)

The power of rate regulation, being retained by the state, cannot be contracted away or interfered with by the city. (*State* v. *Sheboygan*, 111 Wis. 23, 86 N. W. 657; *Old Colony Trust Co.* v. *Atlanta*, 83 Fed. 43; *Portland Ry., L. & P. Co.* v. *Railroad Commission*, 56 Or. 468, 105 Pac. 709, 109 Pac. 273; *Keefe* v. *Lexington etc. R. Co.*, 185 Mass. 183, 70 N. E. 37.)

MR. JUSTICE HOLLOWAY delivered the opinion of the court.

In 1912 the city of Billings, by ordinance granted to W. B. Snyder, his successors and assigns, the right to lay gas mains and pipes in the streets, avenues and alleys and supply the inhabitants with illuminating gas. The ordinance fixed a maximum rate to be charged during the first two years, and provided that thereafter such rate should be reduced from time to time as the total annual consumption of gas increased to

certain stated amounts. The terms of the ordinance were accepted, and the gas company, succeeding to Snyder's interests, installed the plant and commenced operations in November, 1912.

In March, 1913, the legislature passed an Act, creating the Public Utilities Commission and defining its duties and powers. (Laws 1913, Chap. 52.) Immediately thereafter the gas company filed with the commission its schedule of rates then in force, and this schedule was approved. The company has likewise complied with the other provisions of the Act. In 1915 the total amount of gas sold by the company reached 30,000,000 cubic feet, and by the terms of the ordinance it was required to reduce its rate from $1.80 per 1,000 cubic feet, to $1.50 per 1,000 cubic feet, but it refused to make the reduction, and this action resulted. The city has appealed from a judgment in favor of the company, and presents for our determination the question: Can the company be compelled to reduce its rates in conformity with the terms of the ordinance, or is the subject of rate regulation and control now within the exclusive jurisdiction of the Public Utilities Commission?

It is conceded that this company is a public utility and subject to the provisions of the statute above. That statute provides that the commission shall have full power of supervision, regulation and control of the public utilities enumerated, "subject to the provisions of this Act and to the exclusion of the jurisdiction, regulation and control of such utilities by any municipality, town or village." (Section 3.) It provides, further, that the charges for heat, light, *etc.*, shall be reasonable (section 5); that every public utility shall file with the commission schedules of rates then in force; that no advance or reduction in rates shall be made thereafter without the approval of the commission (section 11); that any municipality or individual interested may complain to the commission of any existing rate (section 17), and, after a hearing, the commission may order into effect a different rate and enforce its order

by appropriate proceedings (section 31). Adequate penalties are prescribed for violations of the Act.

There are certain principles incidentally involved herein which may be stated by way of preface.

1. The right granted to the company to use the streets for [1] laying its mains is a franchise. (Pond on Public Utilities, sec. 398.)

2. The acceptance of the franchise, which contained terms, [2] constituted a contract between the city and the company, if the city had authority to make such contract.

3. There is a well-defined distinction between the authority [3] of a city to regulate public utility rates from time to time and the authority to fix rates by contract for a definite period. (4 McQuillin on Municipal Corporations, sec. 1733.)

4. When the city has entered into a binding contract with a [4] public utility, fixing rates for a definite period, it surrenders for the duration of the contract its governmental function of rate regulation, so far as altering the contract rates is concerned. (*Detroit* v. *Detroit Citizens' St. R. Co.,* 184 U. S. 368, 46 L. Ed. 592, 22 Sup. Ct. Rep. 410.)

5. A city of this state has only such authority as is conferred [5] upon it by express legislative declaration or by necessary implication (*Helena L. & Ry. Co.* v. *City of Helena,* 47 Mont. 18, 130 Pac. 446), and any doubt as to the existence of a particular power will be resolved against the city, and the right to exercise the power denied. (*State ex rel. Quintin* v. *Edwards,* 40 Mont. 287, 20 Ann. Cas. 239, 106 Pac. 695.)

6. Since a city exercises only limited, delegated authority, [6] anyone claiming the benefit of the city's act has the burden of showing that it acted within the scope of its authority.

7. A city is prohibited by section 3291, Revised Codes, from [7] granting a franchise of the character of the one now under consideration, until the application for it has first been submitted to and approved by the qualified electors, and this statute was in force at the time the franchise in question was granted.

8. A city cannot bind its inhabitants by a contract unreason-
[8]  able in its terms.  (*Davenport* v. *Kleinschmidt,* 6 Mont.
502, 13 Pac. 249.)

This case was submitted to the trial court upon an agreed
statement of facts, which fails to disclose the term of years
for which the franchise was granted, and likewise fails to show
that the application for the franchise was first approved by a
vote of the qualified electors.  For either or both of these rea-
sons the judgment should be affirmed, but counsel have ignored
these defects, and have submitted the appeal upon the assump-
tion that the franchise was granted properly, and that a valid
contract resulted from its acceptance, if the city had the author-
ity to contract for specific rates for any period.  The city has
not assumed to exercise a governmental function of rate regu-
lation, but it does insist that it was clothed with authority to
contract for maximum rates, and that the obligation of the
contract which it has with the gas company cannot be impaired
by the legislature.

If the city was authorized to enter into a contract of this
character and there was no reservation in the contract of the
city's right to regulate the rates, then it may be conceded that
the contract is inviolable, and that the city is entitled to have
the rate provision enforced.  (*Cleveland* v. *Cleveland City R.
Co.,* 194 U. S. 517, 48 L. E'd. 1102, 24 Sup. Ct. Rep. 756.)  As
evidence of its authority to make this particular contract, the
city relies upon the provisions of paragraphs 63 and 73, section
3259, Revised Codes.  With the introductory clause, those para-
graphs provide:

"A city or town council has power:  *  *  *

"63. To make any and all contracts necessary to carry into
effect the powers granted by this title, and to provide for the
manner of executing the same.  *  *  *

"73. To permit the use of the streets and alleys of the city
or town for the purpose of laying down gas, water and other
mains," *etc.*

As heretofore observed, rate regulation of public utilities is
[9] distinctively a legislative function of the state, and,
though the state may confer upon a city authority to enter into
a contract for specific rates for a given period, since the effect
of such a grant is to extinguish *pro tanto* a governmental
power of first importance, the courts will not indulge the pre-
sumption that such a surrender of power has been made, unless
the legislative intention is expressed in clear and unmistakable
language or is necessarily implied from the powers expressly
granted, and all doubts will be resolved in favor of the continu-
ance of the power. (*Home Tel. Co.* v. *Los Angeles*, 211 U. S.
265, 53 L. Ed. 176, 29 Sup. Ct. Rep. 50; Pond on Public Utili-
ties, secs. 498, 502.) Neither paragraph 63 nor 73 in express
[10] terms confers upon a city authority to fix rates. Can
it be said that such authority is necessarily implied from the
language used?

Provisions somewhat similar to the terms of these paragraphs
are found in the statutes of many states, and, though they have
been a fruitful source of litigation, the decisions are not har-
monious, but in a general way it may be said that they form
three distinct groups. The cases composing the first group hold
that statutes of this character do not confer any rate-making
power whatever. Typical cases are *Pioneer T. & T. Co.* v.
*State*, 33 Okl. 724, 127 Pac. 1073; *St. Louis* v. *Bell Tel. Co.*,
96 Mo. 623, 9 Am. St. Rep. 370, 2 L. R. A. 278, 10 S. W. 197,
and *Mills* v. *Chicago* (C. C.), 127 Fed. 731. Cases of the second
group hold that such statutes by necessary implication confer
the power to fix rates for a definite period, not unreasonable in
extent. (*Boerth* v. *Detroit Gas Co.*, 152 Mich. 654, 18 L. R. A.
(n. s.) 1197, 116 N. W. 628. See, also, Pond on Public Utili-
ties, sec. 420.) In the third group are cases which hold that,
though statutes of this character do not confer directly any
rate-making authority, they do amount to a sort of tacit recog-
nition by the state of the city's right to contract for rates, sub-
ject, however, to the paramount authority of the state when-
ever it chooses to exercise its sovereign power of rate regulation

and control.   (*Milwaukee Elec. Ry. & L. Co.* v. *Wisconsin R. R. Com.*, 153 Wis. 592, Ann. Cas. 1915A, 911, L. R. A. 1915F, 744, 142 N. W. 491, 59 L. Ed. 1254, 238 U. S. 174, 35 Sup. Ct. Rep. 820; *City of Dawson* v. *Dawson Tel. Co.*, 137 Ga. 62, 72 S. E. 508.)   The principle enunciated by this third group of cases has been recognized and acted upon in this jurisdiction for many years, and is in harmony with the general spirit and purpose of our laws.

If the state has clearly authorized the municipality to contract for the service of a municipal public utility and to fix the rates for a definite period, a contract made in pursuance of such authority cannot be set aside by the state, but it is only in those cases where the authority delegated to the municipality clearly confers upon it the power to agree upon rates for a definite period, and a contract has been made pursuant to such authority, that the state precludes itself from exercising its undoubted governmental function of rate regulation and control.   (Pond on Public Utilities, sec. 503.)

We do not believe that it was the purpose of the legislature [11] by the very general language in the paragraphs cited to surrender fully the distinctively governmental function to regulate rates, but rather to permit municipalities to protect themselves and their inhabitants against extortionate rates until the state itself should act in the premises.   Under this view it cannot be said that the Act of 1913 impairs the obligation of the franchise contract (assuming that the city can raise the question), for both parties to that agreement must have entered into it with full knowledge that in the state itself reposed the sovereign power of rate regulation.   (*Manitowoc* v. *Manitowoc & N. T. Co.*, 145 Wis. 13, 140 Am. St. Rep. 1056, 129 N. W. 925; *Benwood* v. *Public Service Com.*, 75 W. Va. 127, 83 S. E. 295.)

But it is insisted on behalf of the city that the Act creating [12] the Public Utilities Commission intended to recognize all outstanding contracts of this character, and reference is made to the concluding sentence of section 12 of the Act.   That sec-

tion first declares that it shall be unlawful for any public utility to collect a different rate from that contained in the schedules approved by the commission. It likewise forbids rebates, concessions or special privileges to any consumer which affects the rates, tolls or charges for the services furnished, and fixes the penalty for any violation and then concludes: "This, however does not have the effect of suspending, rescinding, invalidating or in any way affecting existing contracts." It is very clear that this sentence refers to the preceding sentence of the section exclusively, and not to the terms of the Act in its entirety.

A consideration of the statute leads to the conclusion that in its enactment the legislature intended to provide a comprehensive and uniform system of regulation and control of public utilities, by a specially created tribunal, through which the state itself exercises its sovereign power.

Our conclusion is that since 1913 the Public Service Commission has had exclusive jurisdiction over the subject of rate regulation of this company, that the provisions of the franchise contract fixing rates were superseded by the rates approved by the commission, and that the remedy of the city is by complaint to the commission if the rates now in effect are excessive.

Finally, it is insisted that the commission has never estab-[13] lished rates for this company, and until it does so, the rates fixed by the franchise contract should be enforced; but, under section 11 of the Act of 1913, existing utilities were required to file schedules of their rates with the commission, and thereafter no change in rates could be made without the concurrence of the commission. In other words, when the tariffs were filed, the designated rates became the legal rates until changed in the manner provided by the Act, and superseded the rates designated in the franchise contract.

The judgment is affirmed.

*Affirmed.*

MR. CHIEF JUSTICE BRANTLY and MR. JUSTICE SANNER concur.