No. 12828

IN THE SUPREME COURT OF THE STATE OF MONTANA

1975

---

LOCKWOOD WATER USERS ASSOCIATION,

Plaintiff and Respondent,

-vs-

GERALD W. ANDERSON, d/b/a
MAGIC CITY VILLAGE,

Defendant and Appellant.

---

Appeal from: District Court of the Thirteenth Judicial District,
Honorable A. B. Martin, Judge presiding.

Counsel of Record:

For Appellant:

Towe, Neely & Ball, Billings, Montana
Thomas E. Towe argued, Billings, Montana

For Respondent:

Moulton, Bellingham, Longo & Mather, Billings, Montana
Ward Swanser argued, Billings, Montana

---

Submitted: September 29, 1975

Decided: NOV 17 1975

Filed: NOV 17 1975

Thomas J. Kearney
_____
Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

This is an appeal from a summary judgment and a permanent injunction issued by the district court, Yellowstone County, restraining defendant Gerald W. Anderson, d/b/a Magic City Village, from hooking up any mobile homes to the facilities owned by the plaintiff association, whether it be to take care of attrition or otherwise, until such time as he can do so and not violate the terms of the agreement and specifically the 60 unit limitation provided for in the agreement or until the parties enter into a new agreement which supercedes the existing agreement.

In 1955 residents of the Lockwood area, adjacent to Billings, Montana, banded together in a voluntary nonprofit corporation organized for the purpose of supplying water to its members. When it was created there were approximately 150 homes servicing some 650 people in an area of some 2,200 acres known as the Lockwood Community. In the 20 years of its existence the population of the area has increased to some 2,630 people who live in 774 homes. Some 590 are members of the Association while some 137 additional homes receive water from the Association through their mobile home courts that are treated as one unit for membership purposes.

At the time of organization the Association obtained a loan from Farmers Home Administration (FHA) to put in a water service line. The loan has not been fully repaid. The FHA took a mortgage on the Association's property obligating it to conduct its business in accordance with the by-laws and certain rules of the FHA. Serious questions would arise from the mortgage provisions, if the Association were to be classified a "public utility".

To finance the Association memberships were sold for $50. The Association adopted articles of incorporation and by-laws in the form suggested by the FHA and it is a nonprofit corporation

- 2 -

organized for the purpose of supplying water to members only. Its by-laws provide: (1) That the Board of Directors shall have power to make, publish and enforce rules and regulations concerning the distribution, use and application of the water under its contract; (2) That the Board of Directors may take legal proceedings to prosecute, defend, compromise all lawsuits, to make all contracts in the name of the corporation necessary and proper for the conduct of the affairs and the carrying on of the business of the corporation; (3) That no membership shall be issued or connections made at any time when the capacity of the system or the available supply of water is exhausted by the needs and demands of existing members and connections; (4) That the manner of delivering, measuring and regulating the supply of water to members shall be prescribed by the corporation, and shall at all times be under its control, and the Board of Directors or the manager, with the consent of said Board, may make such rules and regulations regarding the distribution and delivery of the water as in its judgment may appear necessary or expedient for the best interests of the corporation and its members; (5) That the membership certificates of any member delinquent in the payment of assessments thereon shall be subject to sale; (6) That the corporation may, through its Board of Directors, after ten days notice by mail of such delinquency, terminate the supply of water to any user who is delinquent in the payment of any water charges, assessments or rentals.

Through the years as the membership increased the Association has adopted rules and regulations which require new members to pay the expense of bringing water from the main to their property lines and then on to their dwellings. This was done through the Board of Directors elected by the membership and who serve without pay. Throughout its existence the Association has assumed

it was not a public utility and at no time during this period has the Public Service Commission ever attempted to regulate the Association.

In 1972, defendant Gerald W. Anderson, d/b/a Magic City Village, requested water for a trailer court. The first request was for a 300 unit court. He was advised by the Association's Board of Directors that he would be required to build a loop from the school to his property line, if he intended to develop the 300 units. He chose to cut down his request for water to 60 units and he was allowed, for the 60 unit development, to take off from a nearby main. The 1972 agreement contains this statement:

> " * * * it is understood by and between the parties that no more than sixty (60) mobile home sites shall be served by such facilities."

This 60 mobile home limitation was put in on the advice of the Association's engineer.

Service was provided to the defendant's development and by October 2, 1972, he was in violation of the agreement and he was requested by the Board to attend a meeting to discuss the matter. He refused to attend. On January 15, 1974, defendant was advised by letter that if he did not reduce the number of units to 60 his service would be terminated. Through his attorney, defendant answered the January 15 letter on January 28:

> "In return for your granting an extension of time on the shutoff date, my client will take the necessary steps to reduce the number of homes served back down to sixty (60) * * *."

In answer to this request the Association notified defendant's attorney that it was willing to try to work the problem out, "However, we will not grant an extension past the end of February."

As a result of these letters Blaine Anderson, son of defendant, on February 7, attended a meeting of the Board of the Association and stated that his father would complete the water

loop originally requested by the Association to get additional units. He asked the Board to allow normal attrition to reduce the number of trailers in the court back to 60. The Board agreed to this request but again defendant did not live up to agreements made with the Board. By March 11 there were 70 trailers on the development. Defendant was notified he had 10 days to reduce to 60. He not only did not comply but rather, in the next 30 days, he told all mobile home dealers of a planned expansion and ran advertisements for additional trailer spaces.

On March 22, 1974, the Association filed a suit to enforce the terms of the agreement and to enjoin defendant from placing additional trailers on the court in violation of the agreement. Coincidently, defendant changed attorneys.

At the time of the show cause hearing the Association's officers testified and introduced exhibits to show the violation of the agreement and that it was not a public utility. The only testimony of defendant went to the need for a restraining order and a bond. No testimony was offered as to the substance of the complaint or that the Association was a public utility.

The trial court found that defendant had violated the contract; that defendant's assertion there was a mutual mistake or fraud in drawing up the agreement was groundless; and, that defendant was estopped from asserting this defense on the grounds he accepted the benefits of the contract and that this evidences an understanding consistent with the agreement.

On appeal, defendant sets forth a number of issues, however we find the only real question to be resolved is whether or not plaintiff's operations come under the Public Service Commission. It is clearly apparent from the testimony of the witnesses and the exhibits introduced that to get water from the Association one must be a member. Only members, as such, are allowed to use

the system and they use it on a nonprofit cost sharing basis, as required by the FHA. By joining the Association, members agree to be bound by its rules and regulations.

Without holding that plaintiff is a form of utility, we will assume that it is and then decide if the service rendered is for the public for which compensation is received.

Section 70-105, R.C.M. 1947, provides:

"Every public utility is required to furnish reasonably adequate service and facilities. * * *"

Defendant argues that under cases of this Court (City of Polson v. Public Service Commission, 155 Mont. 464, 473 P.2d 508; Hames v. City of Polson, 123 Mont. 469, 215 P.2d 950; State ex rel. Billings v. Billings Gas Co., 55 Mont. 102, 173 P. 799) the Association is a public utility, cannot deny service to anyone in its area, and being a public utility the agreement is unenforceable as contrary to public policy and the clear mandate of the law. Under the facts here, we do not agree. The general law is found in 73 C.J.S. Public Utilities § 2, P. 992 and § 7b, P. 1000:

"The test is, therefore, whether or not such person holds himself out, expressly or impliedly, as engaged in the business of supplying his product or service to the public, as a class, or to any limited portion of it, as contradistinguished from holding himself out as serving or ready to serve only particular individuals. * * * It has been stated that the true criterion by which to determine whether a plant or system is a public utility is whether or not the public may enjoy it of right or by permission only. * * *"

"Accordingly, a utility must act toward all members of the public impartially, and treat all alike, and it cannot arbitrarily select the persons for whom it will perform its service or furnish its commodity, or refuse to one a favor or privilege which it has extended to another, since the term 'public utility' precludes the idea of service which is private in its nature and is not to be obtained by the public. * * *"

While Montana has not had occasion to define the term "public utility", a number of jurisdictions have established a

workable definition by case law. 64 Am Jur 2d, Public Utilities, §5, p. 553, notes:

> " * * * In the absence of statute, the most im-
> portant test used in determining whether such an
> organization or group is in fact a public utility
> in this respect is the factor of serving or will-
> ingness to serve the entire public within the
> area in which the facilities of the organization
> are located. If it confines its service to its
> own stockholders or to members of its own group,
> and does not serve or hold itself out as willing
> to serve the public, it is not ordinarily con-
> sidered a public utility. * * *"

See: Cherry Lake v. Kearce, 157 Fla. 484, 26 So.2d 434; Garkane Power Co. v. Public Service Com., 98 Utah 466, 100 P.2d 571, 132 ALR 1490; State v. Nelson, 65 Utah 457, 238 P. 237, 239, 42 ALR 849.

In Nelson, cited with approval in Garkane Power Co., the Utah court held:

> "No one may successfully contend that it is compe-
> tent for the Legislature to regulate and control
> in such respect a mere private business or to
> declare a private business to be public service
> or a public utility. In other words, the state
> may not, by mere legislative fiat or edict, by
> regulating orders of a commission, convert mere
> private contracts or a mere private business into
> a public utility or make its owner a common carrier.
> [Citing cases] So, if the business or concern is
> not public service, where the public has not a
> legal right to the use of it, where the business
> or operation is not open to an indefinite public,
> it is not subject to the jurisdiction or regulation
> of the commission."

See also: 73 C.J.S. Public Utilities §2, p. 991; So. Cal. Edison Co. v. Railroad Comission, 194 Cal. 757, 230 P. 661; Choctaw Electric Co-operative v. Redman, Okla. 1954, 293 P.2d 564; San Miguel Power Ass'n v. Public Service Com., 4 Utah 2d 252, 292 P.2d 511.

In the instant case, the trial judge issued a memorandum and order, noting:

> "At the hearing on the restraining order plaintiff
> presented evidence covering the purpose, formation
> and operation of its business. Testimony was also

taken as to negotiations leading up to the contract, the pertinent provisions of the contract, and defendants alleged violations thereof. The Court entered its findings of fact and conclusions of law by which it denied the defendant's claim that the Court had no jurisdiction, and thereafter entered judgment granting plaintiff the permanent injunction it sought."

After careful examination and consideration of the trial court's findings of fact, conclusions of law and judgment, we find them to be correct. Here, service is rendered only to members who share the costs of operation. The service is contractual.

Having so found, it is unnecessary for us to consider defendant's jurisdictional question. The trial court found a breach of contract and properly granted summary judgment.

The judgment is affirmed.

_____
                              Justice

We concur:

_____
    Chief Justice

_____

_____
    Justices

_____
Hon. Paul Hatfield, district judge,
sitting in place of Mr. Justice
Frank I. Haswell.

- 8 -