No. 00-776

IN THE SUPREME COURT OF THE STATE OF MONTANA

2002 MT 179

FAIR PLAY MISSOULA, INC.,
a Montana non-profit corporation,

   Plaintiffs and Appellants,

  v.

CITY OF MISSOULA, a municipal
corporation, and PLAY BALL
MISSOULA, INC., a Montana non-
profit corporation.

   Defendants and Respondents.

APPEAL FROM: District Court of the Fourth Judicial District,
      In and for the County of Missoula,
      The Honorable John W. Larson, Judge presiding.

COUNSEL OF RECORD:

   For Appellant:

     Alan F. Blakley, Blakley & Velk, Missoula, Montana

   For Respondents:

     Jim Nugent, Missoula City Attorney, Missoula, Montana (City of Missoula);
     Bradley J. Luck, Garlington, Lohn & Robinson, Missoula, Montana (Play Ball
     Missoula, Inc.)

            Submitted on Briefs: May 31, 2001

            Decided: August 13, 2002

Filed:

          _____
               Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 Fair Play Missoula, Inc. ("Fair Play") initiated this action to enjoin the City of Missoula ("City") and Play Ball Missoula, Inc. ("Play Ball") from further development of a proposed civic baseball stadium due to the City's alleged failure to comply with statutory requirements for planning, funding, and managing the facility. The Fourth Judicial District Court, Missoula County, dismissed all claims on summary judgment. Fair Play appeals. We affirm..

¶2 We restate the issues Fair Play raises as follows:

¶3 1. Whether the District Court correctly held that the Agreements between the City and Play Ball are leases and do not grant an exclusive franchise?

¶4 2. Whether the District Court correctly held that the Development Agreement is governed by a statute relating to municipal athletic fields and civic stadiums rather than Montana's urban renewal laws?

¶5 3. Whether the District Court abused its discretion by denying Fair Play's motion to vacate the summary judgment hearing?

## FACTUAL AND PROCEDURAL BACKGROUND

¶6 Play Ball, a volunteer, non-profit corporation organized for the purpose of locating a minor league baseball team in Missoula, Montana, seeks to construct a stadium to a professional team's specifications. On March 6, 2000, Play Ball and the City entered a Missoula Civic Stadium Development Agreement ("Development Agreement"), which permitted Play Ball to finance and construct a stadium on City property and convey the completed facility to the City. The parties also executed a Civic Stadium Use Agreement ("Use Agreement"), which outlined the City's policies and requirements for Play Ball's continuing maintenance, operation and management of the proposed stadium.

¶7 After encountering substantial public opposition to stadium construction at two other

2

proposed locations within the city limits, Play Ball arranged for the donation of an abandoned lumber mill site along the south bank of the Clark Fork River adjacent to McCormick Park. Play Ball paid for an environmental assessment at the site and agreed to accept liability for all necessary environmental remediation. The City accepted a gift from Champion International Corporation of approximately five acres ("the Champion site") on April 12, 2000, without any restrictions upon the City's future use of the property. The gifted land is located within the boundaries of the designated Missoula urban renewal area.

¶8 On April 24, 2000, the Missoula City Council adopted Ordinance No. 3151, which approved tax increment funding for "improvements separate from, but related to, a civic stadium." The City's proposed ancillary capital improvements included laying water and sewer connections, purchasing adjacent land for stadium parking, stabilizing the river bank, and constructing streets, neighborhood traffic-calming devices and bicycle paths.

¶9 Fair Play, a non-profit corporation organized by Missoula residents, filed for an injunction on May 5, 2000, to bar the City and Play Ball from proceeding with stadium development. The Complaint alleged that Play Ball's proposed stadium construction at the Champion site was an urban renewal project, which required the City to follow a mandated public participation processes and to use the criteria for project approval outlined by statute. Fair Play also claimed the Development and Use Agreements granted an exclusive franchise to Play Ball and that the Agreements were void due to the City's failure to obtain the prior approval of Missoula voters.

¶10 After extensive discovery, the City and Play Ball separately moved for summary judgment. The District Court set a hearing date of August 2, 2000, and ordered all documents to be filed by July 26, 2000. The City submitted one affidavit on July 27, 2000. Fair Play moved to strike the

3

affidavit or vacate the hearing. The court bumped the hearing one day forward to accommodate the one-day delay in the City's filing, and extended Fair Play's filing time. Due to a scheduling conflict of counsel, Fair Play again moved to vacate. The court reset the hearing for the afternoon on August 3, 2000, and denied the motion. Substitute counsel represented Fair Play at the hearing.

¶11 By Order issued on September 15, 2000, the District Court granted summary judgment in favor of the City and Play Ball. Fair Play appeals.

## STANDARD OF REVIEW

¶12 Our standard of review of appeals from summary judgment is *de novo*. We apply the same criteria applied by the district court pursuant to Rule 56(c), M.R.Civ.P. *Enger v. City of Missoula*, 2001 MT 142, ¶ 10, 306 Mont. 28, ¶ 10, 29 P.3d 514, ¶ 10. The moving party must establish both the absence of genuine issues of material fact and entitlement to judgment as a matter of law. *Enger*, ¶ 10. Once the moving party has met its burden, the opposing party must present material and substantial evidence, rather than mere conclusory or speculative statements, to raise a genuine issue of material fact. *Enger*, ¶ 10. We review a district court's conclusions of law to determine whether the court's conclusions of law are correct. *City of Bozeman on Behalf of Dept. of Transp. of State of Mont. v. Vaniman* (1994), 264 Mont. 76, 80, 869 P.2d 790, 793.

## ISSUE I

¶13 **Whether the District Court correctly held that the Agreements between the City and Play Ball are leases and do not grant an exclusive franchise?**

¶14 Fair Play raised no issue of material fact before the District Court, but challenges the court's conclusion that the Development and Use Agreements are merely leases. Fair Play contends that the City also granted Play Ball an exclusive franchise, which must be submitted to the voters for prior approval. To substantiate this claim, Fair Play points out that Play Ball is granted the exclusive right

4

to build and name the baseball stadium, to manage all events and to charge fees for facility use.

¶15    The City maintains that, although an exclusive right to build upon the Champion site is afforded Play Ball under the Development Agreement, this provision is consistent with all construction leases.  Play Ball agreed to pay all construction costs and to convey the completed stadium to the City without charge.  The Use Agreement expressly requires Play Ball to manage the stadium in accordance with policies set by the City Council and to grant the City free use of the facility six times each year.  The City will continue active oversight of stadium management and appoint citizens to an Extraordinary Events Committee to establish the policies, criteria and limitations on stadium use "for cultural, social and political events consistent with the use of a city park."  Play Ball is required under the Agreements to insure the premises and hold the City harmless from liability.  If Play Ball fails to abide by any terms or conditions of the Agreements, it will forfeit its leasing privileges and management rights.  Accordingly, the Respondents assert the Development Agreement leases the Champion site to Play Ball for the purpose of building a stadium and the Use Agreement leases the completed stadium to Play Ball to manage, subject to specific terms and conditions.

¶16    Our statutes provide no definition for the term "franchise."  The 1889 Montana Constitution classified a franchise as property subject to taxation.  Art. XII, sec. 16 and 17, Mont. Const. of 1889.  Our 1972 Constitution includes no comparable provision, but Article II, Section 31 states that no law "making any irrevocable grant of special privileges, franchises, or immunities, shall be passed by the legislature."  See *D & F Sanitation Serv. v. Billings* (1986), 219 Mont. 437, 713 P.2d 977 (upholding constitutionality of § 7-2-4736, MCA, a statute that preserves garbage haulers' franchise but also provides means for revocation).  This Court has noted that a franchise is incorporeal

property, a "special privilege conferred by the government on an individual which does not belong to the citizens generally." *Goldt v. City of Missoula* (1948), 121 Mont. 178, 183, 190 P.2d 545, 547.

Section 7-5-4321, MCA, states in pertinent part:

> (1) The council may not grant an exclusive franchise or special privilege to any person except in the manner specified in subsection (2). . . .

> (2) An exclusive franchise for any purpose . . . may not be granted by any city or town or by the mayor or city council to any person, association, or corporation without first submitting the application for an exclusive franchise to the electors of the city at a regular or primary election.

¶17     As examples of public privileges granted as franchises to individuals and not enjoyed by the citizens generally, this Court has mentioned street railways laying tracks and operating cars on public roads; telegraph and telephone companies erecting poles and wires across public and private lands; and water companies tearing up streets and impeding travel to install and repair mains. *See Wells Fargo & Co. v. Harrington* (1917), 54 Mont. 235, 169 P. 463. However, we held that an overland transport company does not operate under a franchise grant as the public roads are open for all freighters. *Wells Fargo & Co.,* 54 Mont. at 244, 169 P. at 466. In *Goldt,* we rejected the notion that a city's agreement to buy parking meters from a single  source and allocate a percentage of parking revenues to the vendor until the purchase price was paid constituted a franchise. Instead, we characterized the agreement as a sales contract. *Goldt*, 121 Mont. at 184, 190 P.2d at 548. By contrast, a municipal agreement with a gas company to install supply lines under city streets and thereby monopolize sales granted a franchise that required prior voter approval. *State ex rel. City of Billings v. Billings Gas Co.* (1918), 55 Mont. 102, 173 P. 799.

¶18     In 1981, the Montana Legislature amended an earlier version of § 7-5-4321, MCA, by inserting the term "exclusive" to modify "franchise." Sec.1, Ch. 283, L. 1981. To release cities

from the requirement of obtaining voter approval prior to granting a non-exclusive franchise to a utility or other entity, the Legislature limited the application of § 7-5-4321, MCA, to those instances when a franchise agreement bars a city from granting the same special privilege to another within the same period. *See* Minutes of the Local Govt. Comm., HB 425, February 12, 1981.

¶19     The Development and Use Agreements with Play Ball do not prohibit the City from executing an agreement with another entity for the construction of a stadium on public property or to lease a city-owned facility for baseball games or any other purpose. In addition, the Agreements do not offer Play Ball an exclusive right to contract with a professional baseball organization in the City's interest. Any franchise agreement between a baseball team and Play Ball is outside the scope of Play Ball's Agreements with the City. Consequently, we conclude the City did not grant an exclusive franchise to Play Ball and the voter approval provisions of § 7-5-4321(2), MCA, do not apply.

¶20     That said, we end our discussion of this issue with the following observation. As the reader no doubt will gather from our discussion, governmental franchise law is not well developed in Montana. Indeed, the term "franchise" in this context is not even defined. Without any positive or negative implications about the project here, it is fair to say that, in the public sphere, our statutes do little to insure that the public interest is protected when local governments consider requests from businesses seeking franchises.

¶21     Historically, traditional users of public property or rights-of-way such as monopoly utilities were deemed to compensate the public in the form of universal services and regulated rates in lieu of fees. In today's unregulated business environment that is no longer the case, however. Government at all levels now actively encourages economic development. Moreover, many technologically based

7

services--telecommunications being the prime example--are expanding exponentially. Accordingly, our governmental leaders shoulder greater challenges to, at one and the same time, promote economic development; encourage viable competition; reach agreements that provide equitable public compensation and fair use of public property and government licenses; address environmental and land use concerns; protect public convenience and safety; and guard against deteriorating service.

¶22 Unfortunately, Montana has failed to develop a comprehensive statutory scheme in this complex area, with the result that the law of governmental franchises will likely develop on a case by case basis in a manner that is reactive, not proactive, and is of marginal guidance to governmental officials struggling with these issues. Accordingly, this area of the law is one which the Legislature may wish to examine in a future session.

## ISSUE II

¶23 **Whether the District Court correctly held that the Development Agreement is governed by a statute relating to municipal athletic fields and civic stadiums rather than Montana's urban renewal laws?**

¶24 The site of the proposed baseball stadium is located within Missoula's designated urban renewal area. For this reason, Fair Play contends that the City was required to comply with the urban renewal laws of Title 7, Chapter 15, Parts 42 and 43, Montana Code Annotated, when it entered the Development Agreement with Play Ball. Fair Play hinges its argument upon the principle of statutory interpretation that a particular legislative intent will control over an inconsistent general provision. *See* § 1-2-102, MCA. Fair Play also references the language defining the scope of our urban renewal laws, which states:

8

Insofar as the provisions of this part and part 43 are inconsistent with the provisions of any other law, the provisions of this part and part 43 shall be controlling. The powers conferred by this part and part 43 shall be in addition and supplemental to the powers conferred by any other law.

Section 7-5-4205, MCA.

¶25    The Missoula City Council accepted the donation of the Champion site and executed the agreement with Play Ball for the construction of a baseball stadium pursuant to § 7-16-4106, MCA, a statute authorizing municipalities to accept athletic fields and civic stadiums as gifts and regulate their use and operation.   Section 7-16-4106, MCA, states, in pertinent part:

> (1) A city or town council may:
>         (a) acquire by gift, purchase, or condemnation pursuant to Title 70, chapter 30, lands for athletic fields and civic stadiums within or outside of the corporate limits of the municipality;
>         (b) establish and regulate athletic fields and civic stadiums;
>         (c) exercise municipal jurisdiction over the acquired land . . .;
>         (d) construct, maintain, and regulate athletic and civic stadiums on the land.
>
> (2) The city or town council may set aside or designate portions of tracts of land now owned by any municipality for the purpose of providing athletic fields and civic stadiums.

Because § 7-16-4106, MCA, requires no procedural formalities prior to the city taking action on the baseball stadium project, Fair Play argues that it is a more general provision and is inconsistent with the more particular statutory procedures governing urban renewal projects.

¶26    The City and Play Ball counter that the urban renewal statutes do not apply because the City never designated the stadium development as an urban renewal project and no urban renewal monies will be used for stadium construction. The City claims that designation of an urban renewal project is optional and no provision in Montana's urban renewal statutes mandates that improvements within

9

the boundaries of an urban renewal district be subject to urban renewal law. Therefore, the City contends that its authority to enter a Development Agreement to lease the city-owned Champion site to Play Ball for the purpose of constructing a stadium does not derive from the powers granted under the urban renewal statutes.

¶27    The Montana Constitution grants broad general powers to units of local government. Article XI, Section 4(1)(a) states that "[a]n incorporated city or town has the powers of a municipal corporation and legislative, administrative and other powers provided or implied by law." Moreover, Article XI, Section 4(2) declares that "[t]he powers of incorporated cities and towns and counties shall be liberally construed."

¶28    The City Council enlarged the Missoula urban renewal area in 1991 to encompass the Champion site, which the City determined to be "blighted." The Legislature directed "that to the extent feasible salvable blighted areas should be rehabilitated through voluntary action and the regulatory process." Section 7-15-4203(3), MCA. Montana's urban renewal statutes require a local government to follow certain procedures when committing public resources to an urban renewal project. For example, the governing body must pass a resolution that amends its urban renewal plan to encompass the proposed project,  § 7-15-4216(2), MCA; conduct a public hearing on the proposal, § 7-15-4214, MCA; and evaluate viability and public benefit of a project based on financial and other statutory criteria, § 7-15-4217, MCA. Public property acquired for an urban renewal project must be leased at not less than fair market value for uses in accord with the urban renewal plan. Section 7-15-4262(3), MCA. A city may sell, lease, or otherwise transfer real property in an urban renewal area by complying with statutory requirements for public notice and solicitation of proposals or "only under such reasonable procedures as [the municipality] shall

10

prescribe." Section 7-15-4263, MCA.

¶29 The statutory definition of "urban renewal projects" states:

"Urban renewal projects" may include undertakings or activities of a municipality in an urban renewal area for the elimination and for the prevention of the development or spread of blight and may involve redevelopment in an urban renewal area, rehabilitation or conservation in an urban renewal area, or any combination or part of redevelopment, rehabilitation, or conservation in accordance with an urban renewal plan.

Section 7-15-4206(19), MCA. Therefore, an urban renewal project must be located within a designated urban renewal area. However, nothing in the definition establishes that all improvements undertaken by a city within an urban renewal area are urban renewal projects.

¶30 As a separate undertaking that is related to the planned stadium, the City Council adopted Ordinance No. 3151, which earmarks tax increment funding to purchase land adjacent to the Champion site for parking, to connect utilities and improve public access. The City designated these associated, publicly-funded site improvements as an urban renewal project and the Missoula Redevelopment Authority ("MRA"), a department within the city government, will oversee the project and coordinate site work with Play Ball's construction schedule. Fair Play did not allege that the City failed to comply with any statutory urban renewal requirements in the course of planning this associated site improvement project.

¶31 The fact that the City Council designated the capital improvements associated with the stadium construction as an urban renewal project and subject to the urban renewal laws does not require that Play Ball's stadium-building come under the same purview. Stadium construction will

11

be entirely financed by Play Ball and the facility will be donated to the City upon completion. Moreover, we perceive no inconsistency between § 7-16-4106, MCA, and our urban renewal laws. Section 7-16-4106, MCA, permits cities and towns to obtain athletic fields and civic stadiums through purchase, donation or condemnation and regulate their use. Nothing in § 7-16-4106, MCA, prohibits the City from making the building of a stadium an urban renewal project, if the project meets the City's priorities for urban renewal funding and other statutory criteria. Conversely, nothing in our urban renewal statutes mandates that the stadium construction be designated an urban renewal project. The decision to proceed with development under the urban renewal provisions rests with the City, and we construe the City's powers liberally. We conclude that Fair Play's argument that the City was bound to comply with Montana's urban renewal statutes because these laws are inconsistent with the authority to acquire and regulate athletic fields and civic stadiums granted under § 7-16-4106, MCA, is without merit.

¶32 Accordingly, we hold the District Court was correct as a matter of law in dismissing Fair Play's claim and concluding that the Missoula City Council appropriately exercised its administrative authority when it accepted the gift of the Champion site and proceeded to lease the site to Play Ball for the purpose of constructing a stadium using private financial resources.

## ISSUE III

¶33 **Whether the District Court abused its discretion by denying Fair Play's motion to vacate the summary judgment hearing?**

¶34 We review discretionary trial court rulings to determine if the court abused its discretion. *In re R.F.*, 2001 MT 99, ¶ 21, 306 Mont. 279, ¶ 21, 32 P. 3d 1257, ¶ 21. To ensure that due process is not violated, the court must provide notice of a hearing and a reasonable opportunity to be heard.

12

*Matter of Adoption of J.M.H.* (1994), 264 Mont. 381, 386-87, 871 P.2d 1326, 1329. Any motion for a continuance is within the sound discretion of the district court and we will not overrule the court's decision to deny a request for a continuance unless there is an affirmative showing of prejudice. *In re Marriage of Pospisil*, 2000 MT 132, ¶ 18, 299 Mont. 527, ¶ 18, 1 P.3d 364, ¶ 18.

¶35 Fair Play claims that the District Court abused its discretion by refusing to continue the oral argument on summary judgment. Counsel for Fair Play, Alan Blakley, informed the court that he had a conflicting court appearance in Butte on the day of the scheduled hearing. Substitute counsel represented Fair Play at the hearing and Fair Play asserts the court "denied Fair Play adequate representation by refusing to reschedule." We are urged to remand the matter for a new hearing.

¶36 The events leading up to the summary judgment hearing on August 3, 2000, are instructive. On June 15, 2000, the District Court scheduled the summary judgment hearing for August 2, 2000. In response to a request for additional brief preparation time, the court extended Fair Play's briefing deadline to July 14. During a meeting between attorneys in chambers on July 24, counsel for the City and Play Ball agreed to move their briefing deadline from July 31 to July 26 in order to preserve the August 2, 2000, hearing date and provide Fair Play with additional time to read Respondents' briefs and affidavits. Respondents filed within the appropriate time with the exception of a single affidavit presented by the Missoula Redevelopment Authority, which was signed by all board members and submitted by the City on July 27. Fair Play moved to strike the affidavit or vacate the hearing. On August 1, the court removed the MRA affidavit from the record and advanced the hearing one day forward to allow Fair Play until August 2 to file all documents it planned to reference in oral argument. Before rescheduling the hearing, court personnel consulted

13

with all the parties by telephone and learned of Blakley's court appearance in Butte. The court then consulted district court personnel in Butte and ascertained that Blakley's August 3 hearing was slated to finish before 11:00 a.m. The court then scheduled the Missoula hearing for 2:30 p.m. to accommodate Blakley's morning travel time. Fair Play again moved for a continuance because counsel Blakley had scheduled a client meeting in Butte to occur after the morning hearing. The court denied the continuance. Blakley did not attend the Missoula hearing in this action and substitute counsel John Rogan from Blakley's firm presented Fair Play's argument.

¶37    The following exchange occurred at the summary judgment hearing:

THE COURT: Where is Mr. Blakley?

MR. ROGAN: He's in Butte. He had a hearing today that was moved from yesterday that created a conflict.

THE COURT: This hearing was moved at his request.

MR. ROGAN: Was it moved at his request?

THE COURT: Yes, it was moved pursuant to a motion which he made. Have you been in touch with him at all today?

MR. ROGAN: Yes, just a phone call from Butte saying that he was still tied up and he'd probably not make it back for the hearing.

THE COURT: And when did he call you?

MR. ROGAN: I believe it was approximately 1 o'clock.

THE COURT: Okay.

MR. ROGAN: But our position is, as the party opposing summary judgment, our

burden is fairly light, a lot less than the parties moving for it, so he gave be a short

briefing and I'll just go to that. . . .

¶38    The City and Play Ball state a concern on appeal that Fair Play filed this action solely to

14

obstruct, stall, and postpone any activity with respect to building the baseball stadium. Play Ball asserts that Blakley could have been present for oral argument on August 3 had he elected to attend. We agree.

¶39    In its brief to this Court, Fair Play misrepresented the conflict in Alan Blakley's schedule as precluding him from attending the Missoula hearing on August 3. The District Court accommodated Blakley's morning court appearance in Butte by setting the Missoula hearing for the afternoon. It appears that Blakley had ample time to return to Missoula to present Fair Play's summary judgment argument. Fair Play also had the opportunity to fully brief the issues prior to the hearing and a review of the transcript reveals that substitute counsel summarized Fair Play's argument as briefed. To claim that the court denied Fair Play due process is disingenuous and an abuse of the appellate process.

¶40    We affirm the denial of Fair Play's second motion to vacate the hearing by the District Court.

## CONCLUSION

¶41    Fair Play failed to raise a genuine issue of material fact that would preclude summary judgment. We hold the conclusions of the District Court to be correct as a matter of law and affirm the court's Order.

¶42    Affirmed.


                                                    /S/ JAMES C. NELSON
We Concur:

/S/ KARLA M. GRAY
/S/ JIM REGNIER
/S/ PATRICIA COTTER
/S/ JIM RICE


15