This is an appeal by Coastal States Gas Transmission Company, Inc. ("Coastal States"), from an order of the Montgomery Circuit Court. That order upheld an order of the Alabama Public Service Commission ("Commission") that required Coastal States to comply with Commission regulations before selling natural gas to industrial customers in Mobile.
Coastal States is a subsidiary of Coastal Corporation. Coastal States owns and operates pipelines in connection with its sales of natural gas to select customers under private contracts. Coastal States entered into private gas purchase and sale contracts with Mobile Bay Refining Company and Union Carbide Corporation. Pursuant to these contracts, Coastal States constructed a pipeline 4,100 feet in length from the Union Carbide plant to the Phillips Petroleum pipeline and constructed another pipeline along Viaduct Road in Mobile from the Phillips Petroleum pipeline to Mobile Bay Refining Company. Coastal States has contacted certain industrial customers of Mobile Gas Service Corporation: Mobile Bay Refining Company; Union Carbide Corporation; Alabama Dry Dock and Shipbuilding Company; Scott Paper Company; *Page 358 
International Paper Company; Eagle Chemical; Diamond Shamrock; and American Cyanamid. It seems clear from testimony adduced by Coastal States' vice president that Coastal States intended to sell natural gas to whatever customers were available if it could make money doing so.
The cause was begun by a complaint filed with the Commission by Mobile Gas Service Corporation ("Mobile Gas"), which requested that the Commission declare Coastal States a utility and prohibit it from constructing "any plant, property, or facility for the sale, delivery, or furnishing" of gas without a certificate of convenience and necessity. In due course, a hearing was held, after which the Commission held that Coastal States was a utility under Code of 1975, § 37-4-1, that it must file tariffs, and that it must comply with other regulations prior to serving any customer.
That order was appealed to the Montgomery Circuit Court, which affirmed the order of the Commission.
The Commission and Mobile Gas argue that the activities of Coastal States, described above, place it within the definition of a "public utility" provided by Code of 1975, § 37-4-1(7):
 "(7) Utility. Such term shall mean and include every person, not engaged solely in interstate business, that now or may hereafter own, operate, lease or control:
". . .
 "b. Any plant, property, or facility for the manufacture, storage, distribution, sale, or furnishing to or for the public of natural or manufactured gas for light, heat or power or other uses."
Each party argues that the substantial weight of the evidence below was in its favor. Since the controlling issue is one of law, however, i.e., whether Coastal States is a "utility," this Court is not bound to apply a presumption that the Commission's order is just and reasonable. Vann Express, Inc. v. Bee LineExpress, Inc., 347 So.2d 1353 (Ala. 1977).
Is Coastal States a public utility subject to the jurisdiction of the Commission? At bottom, this question is one of the interpretation of the phrase "to or for the public" contained in § 37-4-1(7)(b).
The subject is not a novel one in this jurisdiction. InAlabama Power Co. v. Cullman County Electric Membership Corp.,234 Ala. 396, 174 So. 866 (1937), this Court was called upon to decide whether the Cullman County Electric Membership Corporation was, as the term was defined in § 9742 of the Code of 1923, a "public utility." It should be noted that the definition of a public utility in the Code of 1923 is identical to that contained in the Code of 1975. It was contended by Alabama Power Company that the Cullman County Electric Membership Corporation was a public utility operating without a certificate of convenience and necessity in competition with Alabama Power Company's business. This Court held that because the statute creating the Cullman County Electric Membership Corporation authorized it to act as a utility in specific terms, its operations were controlled by the statute creating it, rather than by the laws governing public utilities in general. In recognizing this exception to the public utility statutes, this Court compared the functions of municipal corporations with those of quasi-public corporations and added:
 "It is contemplated in both that all the inhabitants in the described territory shall be eligible to obtain the service by complying with the reasonable conditions. So that they are both serving and constituted to serve the public in that area — an essential element of a utility, State ex rel. Wood v. Consumers' Gas Trust Co., 157 Ind. 345, 61 N.E. 674, 55 L.R.A. 245." 234 Ala. at 401, 174 So. at 869.
In Southern Liquid Gas Co. v. City of Dothan, 253 Ala. 350,44 So.2d 744 (1950), this Court commented again upon the nature of a public utility. In that case, the plaintiff gas company sought to recover certain money it had paid the city, under protest, as business license fees based upon gross receipts, when, as it alleged, it was not a public utility, even though it distributed artificial gas by tanks, drums, etc. Thus, plaintiff contended, as applied to it, *Page 359 
the ordinance under which those fees were imposed was void. This Court wrote:
 "[Plaintiff sought to recover] on the theory that a license was exacted from the plaintiff under an ordinance adopted by the municipality prescribing a license against those engaged in the gas distributing business and that the city adopted the ordinance under authority of § 745, Title 37, Code of 1940, as amended [to read as follows:] 'Public utilities. — The maximum amount of privilege or license tax which the several municipalities within the state may . . . assess and collect of . . . gas companies . . . shall not exceed three percent of the gross receipts of the business . . . in the municipality for the preceding year. . . .' Pursuing the foregoing theory it is alleged [in the complaint] that the plaintiff is not a public utility and therefore cannot be taxed under an ordinance alleged to have been adopted pursuant to the statute. It is argued that it must be assumed on demurrer that the ordinance was so adopted."
253 Ala. at 353, 44 So.2d at 746-47. In deciding that the allegations of the pertinent counts failed to state causes of action, this Court added:
 "The true question to be decided is whether the city has the power to adopt the ordinance. The pleader cannot restrict this question by alleging that the ordinance was adopted under one statute if the city had the right to adopt the ordinance under another statute. A demurrer . . . does not admit erroneous conclusions of law. . . ."
253 Ala. at 353-54, 44 So.2d at 747. The Court then explained why the demurrer was not well taken:
 "There can be no doubt that the city had ample authority subject to constitutional restrictions to provide a license under the provisions of § 735 [authorizing municipalities to license businesses, etc.]. It is true that the amount of the license tax is the amount provided for in § 745 [establishing the maximum amount of license tax imposed by a municipality upon public utilities] . . . but this does not mean that the amount in § 745 [not to exceed 3% of gross receipts per year] could not be used in fixing the amount under § 735."
253 Ala. at 354, 44 So.2d at 747. It was apparently argued by the City of Dothan that the demurrer was sufficient because on its face the complaint (count 2) showed that the plaintiff was a public utility. The Court rejected that argument with this pertinent discussion of the then-statutory definition, which is identical to the present one:
 "The statute, § 302, Title 48, Code of 1940, defines 'the term "utility," when used in this chapter, [to] mean and include every person, not engaged solely in interstate business that now or may hereafter own, operate, lease or control * * * (4) Any plant, property, or facility for the manufacture, storage, distribution, sale or furnishing to or for the public of natural or manufactured gas for light, heat or power or other uses.' In discussing subsection (3) of this statute, formerly § 9742(3) of the Code of 1923, this court pointed out that a corporation organized under general laws applicable to all corporations even though it has the power to engage in the utility business, is not a utility until it engages in such service or holds itself out to do so. Alabama Power Co. v. Cullman County Electric Membership Corp., 234 Ala. 396, 174 So. 866. In the foregoing case it was further shown that an essential element of a utility is that it is both serving and is constituted to serve all the inhabitants in the area who comply with reasonable conditions. In the case at bar there is nothing to show that appellant was organized as a utility or is acting as such. The mere fact that it is 'a gas distributing company, distributing artificial gas by tanks, drums, cylinders or otherwise' does not show that it must do so upon compliance by its customer with certain conditions."
253 Ala. at 354, 44 So.2d at 747.
In Miller v. Hillview Water Works Project, Inc., 273 Ala. 267, 139 So.2d 337 (1962), this Court once again commented upon the nature of a public utility. In that case, the owner of a residence wished to *Page 360 
avoid the water company's regulation that only one house be connected to any one "tap" off the company's main water line. When the company refused an exception, the owner petitioned for a writ of mandamus directed to the water company to compel it to allow him that access. The water company demurred to the petition, apparently on the ground that the water company's denial was based upon an exercise of discretion it possessed in promulgating the "one tap" rule. Having found that the petition itself showed that the water company was a public utility, this Court explored the ramifications of that finding, with this significant observation:
 "A public utility is obligated to serve all members of the public that it holds itself out to serve, fairly and without discrimination. . . .
 "This duty to serve the public exists independent of statute regulating the manner in which such utilities do business. . . . The duty is imposed because they are organized to do a business affected with a public interest and are held out to the public as being willing to serve all of its members. . . .
 "There are, however, conditions precedent to the obligation of a public utility to serve any particular applicant. The applicant must submit to such reasonable conditions as the utility sees fit to impose. . . . One of the conditions precedent to the right of a citizen to be supplied with water, which a water company may require, is that the citizen provide the proper means of conveying the water from the water main onto his property. . . ."
(Citations omitted.) 273 Ala. at 271, 139 So.2d at 339-40. The Court then found that the "tap on" rule was a reasonable rule of operation and held that mandamus would not lie, since there was no showing of a clear legal right to relief.273 Ala. at 272, 139 So.2d at 340.
It cannot be unnoticed that this long-held view of this Court of the definition of a "public utility" in our statute, now § 37-4-1(7), has remained unchanged. Indeed, not all purveyors of energy commodities are "public" utilities, even though they sell and distribute their products under statutory regulation. See, e.g., Hall v. Dexter Gas Co., 277 Ala. 360, 170 So.2d 796
(1964), in which this Court noted at 277 Ala. 364,170 So.2d 799:
 "Dexter Gas Company seems to be engaged in the business of selling, distributing, storing and transporting a liquified petroleum gas called propane, which is admittedly a dangerous commodity. While perhaps not a public utility as that term is defined . . ., Dexter Gas Company is subject to the provisions of the Alabama Liquified Petroleum Gas Act. — Act 275. . . .
 "Although Dexter Gas Company is not a public utility, the legislature of this state has recognized the dangerous propensities of liquified petroleum gas by the enactment of Act 275, supra. The undertaking by a supplier of liquified petroleum gas to furnish its product to the tanks of its customers calls for the same degree of care required of public utilities generally in their service to the public."
The legislature has used the words "public utility" in §37-4-1(7). When plain language is used in a statute, this Court is bound to interpret that language to mean exactly what it says. Ex parte Jones, 456 So.2d 380 (Ala. 1984); Ex parteMadison County, 406 So.2d 398 (Ala. 1981).
Webster's Dictionary (New Riverside ed. 1984) defines a "public utility" as "a private business organization, subject to governmental regulation, that provides an essential commodity or service, as water, electricity, or communication, to the public." And, in Black's Law Dictionary, (5th ed. 1979) at 1104, the term "public utility" is defined as:
 "A privately owned and operated business whose services are so essential to the general public as to justify the grant of special franchises for the use of public property or of the right of eminent domain, in consideration of which the owners must serve all persons who apply, without discrimination. It is always a virtual monopoly. *Page 361 
 "A business or service which is engaged in regularly supplying the public with some commodity or service which is of public consequence and need, such as electricity, gas, water, transportation, or telephone or telegraph service. Gulf States Utilities Co. v. State, Tex.Civ.App., 46 S.W.2d 1018, 1021. Any agency, instrumentality, business, industry or service which is used or conducted in such manner as to affect the community at large, that is, which is not limited or restricted to any particular class of the community. The test for determining if a concern is a public utility is whether it has held itself out as ready, able and willing to serve the public. The term implies a public use of an article, product, or service, carrying with it the duty of the producer or manufacturer, or one attempting to furnish the service, to serve the public and treat all persons alike, without discrimination. It is synonymous with 'public use,' and refers to persons or corporations charged with the duty to supply the public with the use of property or facilities owned or furnished by them. Buder v. First Nat. Bank in St. Louis, C.C.A.Mo., 16 F.2d 990, 992. To constitute a true 'public utility,' the devotion to public use must be of such character that the public generally, or that part of it which has been served and which has accepted the service, has the legal right to demand that the service shall be conducted, so long as it is continued, with reasonable efficiency under reasonable charges. The devotion to public use must be of such character that the product and service is available to the public generally and indiscriminately, or there must be the acceptance by the utility of public franchises or calling to its aid the police power of the state."
Those definitions of a "public utility" accord with the position taken by this Court when it has been called upon to interpret that term. Miller; Southern Liquid Gas Co.; AlabamaPower Co., supra. We also find support in other decisions. In Florida, for example, the Third District Court of Appeals held in Village of Virginia Gardens v. City of Miami Springs,171 So.2d 199, 201 (Fla.Dist.Ct.App. 1965), that one municipality which sold water to another municipality under a contract rate which the other considered to be unreasonable was not operating as a public utility:
 "We thus reach the question of whether the defendant city is acting as a public utility in supplying water to the plaintiff city for distribution by the plaintiff city to its residents. We think that this question must be answered adversely to the appellant under authority of the definition of a public utility set forth in Higgs v. City of Fort Pierce, Fla.App. 1960, 118 So.2d 582. The court in the Higgs case adopted the definition of a public utility set forth in Southern Ohio Power Co. v. Public Utilities Commission, 1924, 110 Ohio St. 246, 143 N.E. 700, 34 A.L.R. 171:
 " 'To constitute a "public utility," the devotion to public use must be of such character that the product and service is available to the public generally and indiscriminately, or there must be the acceptance by the utility of public franchises or calling to its aid the police power of the state.' 118 So.2d at 585.
 "The Supreme Court of Colorado was called upon to decide a question similar to the one presented here in City of Englewood v. City County of Denver, 123 Colo. 290, 229 P.2d 667 (1951). The City County of Denver purchased a water system from a private owner. The public utility at the time of purchase also supplied the City of Englewood. Denver increased the rate charged the residents of Englewood and Englewood sought an injunction and other relief. The Supreme Court held that Denver was not under a public duty to furnish water to Englewood and therefore was not subject to regulation. In so holding it was found necessary to define a public utility and determine whether or not Denver was acting as a public utility. The court held:
 " 'We find little need to enter into a lengthy discussion of what is or what is not a public utility, because we would ultimately apply the almost universally *Page 362 
accepted test, which summarized is, that to fall into the class of a public utility, a business or enterprise must be impressed with a public interest and that those engaged in the conduct thereof must hold themselves out as serving or ready to serve all members of the public, who may require it, to the extent of their capacity. The nature of the service must be such that all members of the public have an enforceable right to demand it.' 229 P.2d at 672."
See also Higgs v. City of Fort Pierce, 118 So.2d 582 (Fla.App. 1960); Stoehr v. Natatorium Co., 34 Idaho 217, 200 P. 132
(1921).
And, in finding that certain actions of a city did not make it a public utility, the Court of Appeals of Tennessee inJohnson City v. Milligan Utility District, 38 Tenn. App. 520,531, 276 S.W.2d 748, 753 (1954), described a public utility:
 "Whether a business operation may be classed as that of a public utility is controlled by the facts of a particular case. Generally, the question depends upon whether the operation has been held out as a public service, upon whether the service is in fact of a public character and whether it may be demanded on a basis of equality and without discrimination by all members of the public or obtained by permission only. 73 C.J.S., Public Utilities, § 2, pp. 991, 993; 43 Am.Jur. 571-573, Public Utilities and Services, Sections 2, 3, 4."
Commenting upon the question of whether one's supplying water to his own property or to that of his neighbors constituted him a public utility, the New Jersey Court of Chancery inJunction Water Co. v. Riddle, 108 N.J. Eq. 523, 526,155 A. 887, 889 (1931), observed:
 "A true criterion by which to judge of the character of the use of any plant or system alleged to be a public utility is whether or not the public may enjoy it of right or by permission only; [citations omitted] and it is not suggested that the public has any right to demand water service from the defendant."
In that same vein is the decision in Lockwood Water UsersAssociation v. Anderson, 168 Mont. 303, 542 P.2d 1217 (1975), which adopted the following language of State ex rel. PublicUtilities Comm'n v. Nelson, 65 Utah 457, 238 P. 237, 42 A.L.R. 849 (1925), which was approved in Garkane Power Co. v. PublicService Comm., 98 Utah 466, 100 P.2d 571, 132 A.L.R. 1490 (1940):
 " 'No one may successfully contend that it is competent for the Legislature to regulate and control in such respect a mere private business or to declare a private business to be public service or a public utility. In other words, the state may not, by mere legislative fiat or edict, by regulating orders of a commission, convert mere private contracts or a mere private business into a public utility or make its owner a common carrier. [Citing cases.] So, if the business or concern is not public service, where the public has not a legal right to the use of it, where the business or operation is not open to an indefinite public, it is not subject to the jurisdiction or regulation of the commission.' "
Coastal States insists that it is not operationally equipped to sell natural gas to the public generally or to small commercial customers, and intends to serve only those with whom it contracts. Presently, as it appears from the record, such customers typify large industrial users of natural gas. A similar marketing situation decided under the exact statutory definition as that in our § 37-4-1(7) is found in Llano, Inc.v. Southern Union Gas Co., 75 N.M. 7, 399 P.2d 646 (1964):
 "Pursuant to simultaneous negotiations between Llano, the Marathon Oil Company and International, Llano entered into two agreements, one with Marathon in January, 1962, to purchase natural gas produced by it from its Lea Unit in Lea County, and the other with International in December, 1961, providing for the delivery and resale to International in Eddy County of gas purchased by Llano from Marathon. Under the gas purchase agreement, Marathon was committed to *Page 363 
furnish the amount of gas required by Llano to fulfill the maximum requirements of the contract with International, and Llano was granted the right to purchase additional gas if and when there were uncommitted reserves in excess of those necessary to fulfill the requirements of International. In addition, this agreement provided that gas delivered to Llano was to be sold only to individual users for industrial use within New Mexico and not to be distributed, sold or furnished to or for the public.
 "Following the execution of these agreements, Llano constructed a 28-mile, six-inch, pipeline for the transportation of gas from the Lea unit to the mine site of International at a cost in excess of $300,000.00. In the construction of the pipeline, two side valves or 'stubs' were installed, each being opposite the location of a potential industrial user of natural gas. None of the funds for the construction of the pipeline was obtained from the public or through the sale of securities, nor was any power of eminent domain asserted in acquiring rights-of-way therefor.
 "Both prior and subsequent to the construction of the pipeline Llano was in contact with other industrial users of natural gas concerning the possibility of supplying them with gas. It is clear from the record that Llano proposed to contract to furnish service to other consumers in the event additional gas reserves became available to it and it was able to negotiate satisfactory arrangements with selected industrial users in the vicinity of its pipeline if by so doing it would not be dedicating its facilities or service to or for the public or subjecting itself to the jurisdiction of the Commission as a regulated utility. At the time of the hearing before the Commission, however, Llano had neither contracted to sell nor had sold gas to any industrial user other than International.
". . .
 "Section 68-3-2(F) of the Public Utility Act, supra, defines a public utility as follows:
 " ' "Public utility" or "utility" means every person not engaged solely in interstate business and except as hereinafter stated, that now does or hereafter may own, operate, lease or control:
" '. . .
 " '(2) Any plant, property or facility for the manufacture, storage, distribution, sale or furnishing to or for the public of natural or manufactured gas, or mixed or liquefied petroleum gas, for light, heat, or power, or other uses; * * *.'
"The crucial question is whether Llano owns or operates anyplant or facility for the sale of natural gas 'to or for thepublic.' [Emphasis added.]
"In view of what was said in Socorro Electric Co-op., Inc. v.Public Service Co., [66 N.M. 343, 348 P.2d 88 (1959)] supra, we deem it unnecessary to consider the decisions of other courts cited in the briefs. Although that case involved an electric cooperative expressly excluded by the Act, this court fully considered the question of what is a public utility within the meaning of the statutory definition set forth above. In that case we quoted from 73 C.J.S. Public Utilities § 2, p. 992, as follows:
 " 'The test is, therefore, whether or not such person holds himself out, expressly or impliedly, as engaged in the business of supplying his product or service to the public, as a class, or to any limited portion of it, as contra-distinguished from holding himself out as serving or ready to serve only particular individuals.
 " 'The public or private character of the enterprise does not depend, however, on the number of persons by whom it is used, but on whether or not it is open to the use and service of all members of the public who may require it, to the extent of its capacity; and the fact that only a limited number of persons may have occasion to use it does not make it a private undertaking if the public generally has a right to such use. * * *' [Emphasis added in Llano.] *Page 364 
and from 43 Am.Jur. 571, Public Utilities and Services:
 " 'As its name indicates, the term "public utility" implies a public use and service to the public; and indeed, the principal determinative characteristic of a public utility is that of service to or readiness to serve, an indefinite public (or portion of the public as such) which has a legal right to demand and receive its services or commodities.' [Emphasis added in Llano.]
 "Applying these rules to the facts in the instant case we think the conclusion is inescapable that Llano at no time held itself out as engaged in supplying natural gas 'to or for the public,' or to any limited portion of the public which might require natural gas, to the extent of Llano's capacity. It is now legally committed to serve but one private industry, and has held itself out as willing to serve only such other private industrial users as it selects, if and when additional natural gas reserves are available to it. Nor do we find any evidence, in support of the Commission's finding and/or conclusion, that Llano has held and is holding itself as ready, willing and able to provide natural gas service to or for the public or any segment thereof."
To the same effect is Wilhite v. Public Service Commission,150 W. Va. 747, 149 S.E.2d 273 (1966). The court's own syllabus of its opinion in that case, at 150 W. Va. 747, 149 S.E.2d 274-75, is pertinent here:
 "1. A corporation which lays its own pipeline to transport natural gas produced or purchased in a gas field and to deliver the same to two large industrial consumers with whom it has negotiated private contracts, and which has not dedicated itself or held itself out to public service and seeks no other customers, is not upon that state of facts a public utility, even though the effect of this is to take a substantial amount of patronage from an existing public utility. However, changes in the type of service rendered or the number of customers served might cause an opposite result in a future proceeding.
 "2. The Public Service Commission of West Virginia has no jurisdiction and no power or authority except as conferred on it by statute and necessary implications therefrom, and its power is confined to the regulation of public utilities. It has no inherent power or authority.
 "3. The test as to whether or not a person, firm or corporation is a public utility is that to be such there must be a dedication or holding out either express or implied that such person, firm, or corporation is engaged in the business of supplying his or its product or services to the public as a class or any part thereof as distinguished from the serving of only particular individuals; and to apply this test the law looks at what is being done, not to what the utility or person says it is doing.
 "4. The mere fact that a product which is usually dispensed by or sold by a utility to the public is being furnished does not make every person, firm, or corporation selling such product a public utility. If such product is sold under private contract and the seller does not hold himself out to sell such product to the public or render some service to the public he is not a public utility.
 "5. The mere transportation of its own gas by a company does not make it a public utility, nor does the furnishing by it of such gas to an industry under a privately negotiated contract to furnish 'firm' (uninterruptible) gas make it a public utility.
 "6. A public utility is protected by its certificate of public convenience and necessity from unauthorized encroachment by other public utilities but is not protected from competition by individuals or corporations acting in their private capacity."
The Commission has reached a contrary result in this case, we respectfully conclude, by arrogating to itself an authority under § 37-4-1(7) that it does not possess. The rationale of its finding that Coastal States is a public utility is, simply put, that a contrary finding would allow Coastal States, and others situated like it, to take *Page 365 
business away from public utilities regulated by the Commission, making its regulation a "sham." Thus, it concluded that its duty was to "balance the interests of the companies involved" and to gauge "the effect of the company's activities upon the public at large." The Commission's order added:
 "It is clear in this case that the sales contemplated by Coastal States will have a much broader effect on the market than just that which it will have upon Coastal States and the two customers with which it presently has a contract. It will affect the price which each and every consumer of natural gas in the Mobile Gas [Service Corporation] service area will pay for the gas which he or she uses."
Whether such a result would be in the offing,[1] nevertheless, the test of a public utility as set out in the Commission's order does not comport with the test that this Court has utilized heretofore, which is supported by the authorities we have cited, and which has remained unchanged at least since 1937.[2] Any modification thereof, we conclude, is properly a matter for legislative action.
Let the judgment be reversed and the cause remanded to the Montgomery Circuit Court for an order consistent with this opinion. It is so ordered.
REVERSED AND REMANDED.
All the Justices concur.
[1] The president of Mobile Gas Service Corporation conceded that, under its block rate to large industrial customers, which was lower than Coastal States' contract price, it is making a profit.
[2] Cf. Code of 1975, § 37-1-36, which states: "When a person is engaged in business, a portion of which business is private business and a portion of which is the business of a utility, the authority, powers and jurisdiction of the commission conferred upon it by law shall not be deemed to apply to and shall not be exercised with respect to that portion of said business which is a private business."