769 So.2d 872 (2000)
LAIDLAW TRANSIT, INC.
v.
ALABAMA EDUCATION ASSOCIATION et al.
Tuscaloosa City Board of Education and its Superintendent, Robert A. Winter
v.
Alabama Education Association et al.
1982234 and 1982235.
Supreme Court of Alabama.
April 21, 2000.
*873 Carl Johnson and Whit Colvin of Bishop, Colvin, Johnson & Kent, Birmingham, for appellant Laidlaw Transit.
J. Russell Gibson III and Jennifer B. Compton of Phelps, Jenkins, Gibson & Fowler, L.L.P., Tuscaloosa, for appellants Tuscaloosa City Board of Education and its Superintendent, Robert A. Winter.
Joe R. Whatley and Maureen Kane Berg of Whatley Drake, L.L.C., Birmingham; and Robert Segall of Copeland, Franco, Screws & Gill, Montgomery (Gregory B. Stein of Stein & Brewster, Mobile; and Cecil Gardner of Gardner & Middlebrooks, Mobile, "of counsel"), for appellees.
David R. Boyd and Beth Moscarelli of Balch & Bingham, L.L.P., Montgomery, for amicus curiae Alabama Association of School Boards.
E.J. "Mac" McArthur, executive director, Montgomery, for amicus curiae Alabama State Employees Association.
HOUSTON, Justice.
The issue in this declaratory-judgment action is whether the defendant Tuscaloosa City Board of Education ("the Board") had the statutory authority to contract with the codefendant Laidlaw Transit, Inc. ("Laidlaw"), for the transportation of students within the Tuscaloosa City School System. The trial court ruled that the Board's contract with Laidlaw violated Ala.Code 1975, § 16-11-9.1, and the Public Education Budget Acts of 1995, 1996, 1997, and 1998 (Ala. Acts 1995, Act No. 95-748, § 5; Ala. Acts 1996, Act No. 96-770, § 8; Ala. Acts 1997, Act No. 97-856, § 9; Ala. Acts 1998, Act No. 98-504, § 17). Based on that ruling, the trial court entered a summary judgment for the plaintiffs, the Alabama Education Association; the Professional Educators of Tuscaloosa Association; Israel Prewitt; and Robert Willis.[1]
After carefully examining the record and the briefs, including the briefs of the amici curiae Alabama Association of School Boards and Alabama State Employees Association, we conclude that the trial court's judgment is due to be affirmed, but not based on the arguments made by the plaintiffs or for the reasons stated by the trial court. We will affirm a trial court's judgment if we find any reason that makes the judgment proper. See Deaton, Inc. v. Monroe, 762 So.2d 840 (Ala.2000); see also Smith v. Equifax Services, Inc., 537 So.2d 463 (Ala.1988).
The facts of this case are not in dispute. Laidlaw has been providing student-transportation services for over 70 years. It has been operating in Alabama since 1988, providing generalized and specialized transportation services to certain Alabama school systems.[2] Laidlaw operates approximately 24,000 school buses and provides medical-transportation services and public-transit services in 35 states, generating annual revenue of approximately $900 million.
In an effort to provide cost-effective transportation services for its students, the Board, through its superintendent, the defendant Robert A. Winter, solicited and *874 received a comprehensive proposal from Laidlaw in March 1995. That proposal included a commitment by Laidlaw to assume responsibility for transporting the students within the Tuscaloosa City School System; to upgrade and fully maintain a modern bus fleet; to comply with all applicable safety and regulatory standards; and to meet applicable driver-certification, safety-training, and substance-abuse requirements. After the proposal had been reviewed by the Board's transportation and finance committees, and upon Superintendent Winter's recommendation, the Board accepted Laidlaw's proposal and entered into a multi-year contract for transportation services, in exchange for a set fee. Under the contract, all Board employees who would be affected by the contract were given the option of accepting employment with Laidlaw or remaining with the Board on the same terms and with the same benefits that existed before the execution of the contract. In addition, Laidlaw assumed direct control and supervision of all bus drivers and transportation-related support personnel. In this respect, the contract provided:
"The CONTRACTOR shall ensure that every school bus driver meets all the regulations of the State ... in regard to application, age, fitness, competence, conduct, licensing, physical examination, and continuing eligibility, provided that such operator shall have passed periodically administered physical examinations.
". . . .
"The CONTRACTOR accepts full responsibility for driver punctuality, neatness and appearance, driving courtesy, driving habits, ability to control the student passengers, pre-trip inspection of the bus and a complete training of drivers.
"The CONTRACTOR accepts full responsibility for investigations of all bus problems.
". . . .
"The CONTRACTOR will maintain the buses to ensure safe transportation for all students utilizing the transportation service.
". . . .
"The CONTRACTOR assumes full responsibility for ensuring that buses, drivers, and transportation of students comply and operate with the rules, regulations, and law as defined by the state of Alabama. The SCHOOL DISTRICT shall have the right to inform the CONTRACTOR of any driver the SCHOOL DISTRICT finds unsatisfactory, and the CONTRACTOR shall make every reasonable effort to correct the problem or replace the driver. However, this provision does not give the SCHOOL DISTRICT the right to control employees of the CONTRACTOR.
". . . .
"The CONTRACTOR shall provide such service to answer complaints relative to transportation as may be needed. The CONTRACTOR will assume the responsibility of providing telephone answering service during the times the buses are operational. Parents of students receiving transportation will be instructed to call the designated number and the CONTRACTOR shall be expected to resolve their questions.
". . . .
"The CONTRACTOR shall be responsible for all aspects of the operation and maintenance of the school buses."
In a document entitled "Coordination with Private Contractor's Policy," the Board set out its policy with respect to an independent contractor's supervision of Board employees:
"The School Board has the authority to contract with private companies to perform work previously performed solely by Board employees. Some of these contracts may require the company to provide all employees needed to perform the work covered by the contract. However, some of the contracts may require that the work be performed solely by Board employees, or by Board *875 employees working with employees of the private company.
"When the Board has contracted with a private company to perform work and the contract includes a provision for some or all of the work to be performed by Board employees, it is the policy of the Board that the Board employees performing that work are required to follow the work rules, safety rules, work schedules, employee handbook, supervision, and other work-related conditions made by the private company, unless those conditions are contrary to any other policy of the Board.
"An employee's failure to comply with the previous section shall be a violation of Board policy and shall subject the employee to appropriate disciplinary action.
"Nothing in this policy is intended to deprive employees of any rights, including their statutory rights under Alabama law, to a hearing, to an opportunity to present evidence, or to an appeal of disciplinary action taken by the Board or its representatives."
Tom Dodd, the Board's assistant superintendent for business operations and its former finance director, testified by affidavit as to the benefits the Board received under its contract with Laidlaw:
"3. In my capacity as Assistant Superintendent for Business Operations, I am responsible for administering the Board's financial and accounting matters, including preparing the Board's annual budget and supervising expenditures to outside contractors such as Laidlaw Transit, Inc.
"4. I was involved in the Board's decision to contract out student transportation services to Laidlaw Transit, Inc. (`Laidlaw'). The Board's decision to contract out student transportation services was motivated by two major concerns: replacing an aging school bus fleet with new, safer, and more modern school buses and saving transportation costs.
"5. The Board's agreement with Laidlaw made it possible to have a new fleet of buses. Prior to the Board entering into the agreement with Laidlaw, the overwhelming majority of the school buses were more than 15 years old. I performed analysis on the estimated cost of replacing the old school buses. An estimated $2.5 million ... was needed in order to purchase enough school buses so as to have a fleet with no school bus more than 5 years old.
"Under the Board's agreement with Laidlaw, Laidlaw has provided 57 new school buses. In the first year of the Agreement, Laidlaw has provided the Board with 41 new, state-of-the-art buses, each with a two-way radio and crossing gate, without any increase in cost from when the Board owned and operated its own school buses. In the 1996-97 school year, Laidlaw added an additional 16 new school buses. As a result, students are transported on buses that are no more than 5 years old whereas before they rode on buses that were more than 15 years old. The school buses provided by Laidlaw have superior visibility, superior maneuverability, ergonomic driver controls, improved driver comfort and satisfaction, and increased vehicle capacity.
"6. As a result of ... its agreement with Laidlaw, the Board enjoyed significant savings in transportation costs. I performed transportation analysis comparing the cost-effectiveness of the Board owning and operating its own school buses with the cost-effectiveness of outsourcing student transportation services to Laidlaw.
"First, through the agreement with Laidlaw, the Board has enjoyed an immediate savings of $2.5 million needed for the purchase of new school buses. Second, by contracting out student transportation, the Board has been able to save approximately $200,000 per year. Moreover, the school district has gained 3 new bus routes with no additional cost. *876 These savings [have] been returned to the instructional programs which were facing cuts as a result [of] decreases in state funding. Thus, by contracting out transportation services, the Board has been able to spend more money on educating the students of Tuscaloosa City Schools.
"In the past, when the Board operated its own school buses, its operating costs increased 10% per year. Since contracting with Laidlaw, operating costs have increased only 3% per year.
"7. The agreement with Laidlaw has also provided the Board with more insurance coverage. Under the agreement with Laidlaw, the Board is named as additional insured on Laidlaw's liability insurance policy. Before contracting out transportation services, the Board had $1,000,000 in liability coverage. By being named an additional insured on Laidlaw's policy the Board now has $5,000,000 in liability coverage.
"8. Through the agreement with Laidlaw, the Board is able to provide more efficient transportation to students. The Board is given the right to use Laidlaw's computerized bus routing program, Edulog. Edulog provides the Board with the ability to run more efficient bus routes, optimizing travel distances and times."
Characterizing the Board's contract with Laidlaw as a "scheme" to reduce the number of its employees and to deny certain benefits to education support personnel, including bus drivers, the plaintiffs challenged the contract on several grounds, specifically: 1) that by contracting with Laidlaw the Board had exceeded its statutory authority to manage its school system; 2) that the contract violated § 16-11-9.1, which places certain restrictions on a city board of education's authority to take necessary and appropriate measures to properly manage its school system; and 3) that the contract violated the Public Education Budget Acts of 1995, 1996, 1997, and 1998. The trial court ruled that the Board's contract was illegal; its order reads in pertinent part as follows:
"Upon due consideration of the briefs and oral arguments of the parties, this Court finds that the [defendant local school board's contract] for full-time support service workers in the schools violate[s] Section 16-11-9.1, Code of Alabama, 1975, and the Public Education Budget Acts of 1995-96, 1996-97, 1997-98, and 1998-99. In particular, [the contract] violate[s] the provisions of the Public Education Budget Acts that prohibit the expenditure of the appropriated funds for `salaries of personnel not under the direct control, employment or [sic] supervision,' of local boards of education. The Court finds that by arranging to pay the entire salaries of ... bus drivers through [a] contract[] with [an] independent contractor[], the local [school board has] violated these provisions.
"The Court further finds that when the Defendant local school board[] here entered [a] contract[] to place [its] ... bus driving staff under [an] independent contractor[], [it] exercised [its] authority in such a way as to attempt to remove rights and benefits under the Teachers' Retirement System, [Public Education Employees' Health Insurance Plan,] and the Fair Dismissal Act. Such exercise of general authority is prohibited under Ala.Code Section 16-11-9.1. The language of the employee benefits statutes, which are written broadly and inclusively, supports this reading of Section 16-11-9.1."
Section 16-1-30(b) provides that a local school board "shall, upon the written recommendation of the chief executive officer, determine and establish a written educational policy for the board of education and its employees and shall prescribe rules and regulations for the conduct and management of the schools." Section 16-11-2(a), Ala.Code 1975, states that "[t]he general administration and supervision of the public schools and educational interest of *877 each city shall be vested in a city board of education." Section 16-11-9 provides:
"The city board of education is hereby vested with all the powers necessary or proper for the administration and management of the free public schools within such city and adjacent territory to the city which has been annexed as a part of the school district which includes a city having a city board of education."
(Emphasis added.) Section 16-11-9.1 states:
"In addition to all authority previously granted by statute, city boards of education may enter into cooperative agreements, projects and programs with the city council or commission, and may take such other actions as they deem necessary and appropriate for the proper management of the public schools; provided, however, that such agreements, projects, and programs shall not be in conflict with nor inconsistent with any law or policy of the State Board of Education and shall not conflict with the purposes for which the school system is established. Provided, further, that such authority shall not be used to deny any employee any legal or constitutional rights to which he or she is entitled, nor shall such authority be used in such a way that employees are denied any benefits established and required by law, nor shall such authority be construed as authorizing city boards of education to levy any taxes not otherwise authorized by law."
(Emphasis added.)
These statutes confer broad power on a city board of education to take those steps it deems necessary to properly educate the children under its charge. The granting of such broad power to a city school board is consistent with, and indicative of, the Legislature's comprehensive approach to education in Alabamaan approach that focuses on the achievement of academic excellence. For example, in § 16-6A-3, part of Chapter 6A, the Education Reform Act of 1984, Ala.Code 1975, § 16-6A-1 to -6, the Legislature stated:
"The Legislature finds that a true need exists within the state for improving education. In furtherance of this goal, a `plan for excellence' and other reform reports have been submitted to the Legislature and the Governor, including therein numerous recommendations that we strongly endorse. It is the intent of the Legislature to promote and support the Governor's recommended program for improving education. It is further the intent of the Legislature that the elements of the Governor's program be implemented and that every effort be made to utilize appropriations provided herein and otherwise recommended for each of these areas. It shall be incumbent upon and the responsibility of each board of education, superintendent, principal and teacher to help provide the implementation of the program."
Section 16-6A-4 provides:
"The Governor's program for improving education shall be implemented subject to sufficient appropriations as provided for herein or as provided for in any other appropriation legislation for public education in the state. Such program shall include, but not be limited to, the following:
"(1) Establishment of the Governor's Educational Reform Commission;
"(2) Development of a comprehensive plan for improving courses in critical needs areas;
"(3) Authorization for an emergency source of teachers in critical needs areas;
"(4) Provision for a scholarship loan program for undergraduate students enrolled in critical needs areas;
"(5) Establishment of a tuition grant program for presently certified teachers to add critical needs areas;
"(6) Development of regional in-service education centers for teachers in critical needs areas;

*878 "(7) Increase in teacher salaries;
"(8) Full statewide kindergarten program;
"(9) Replacement of school buses;

"(10) Library enhancement;
"(11) Burned-out schools program."
(Emphasis added.)
In addition, in § 16-6B-1, part of the chapter entitled "Education Accountability Plan," the Legislature stated: "The Legislature finds that the people of Alabama desire two basic things from their public schools: (1) high achievement for students [and] (2) a safe and orderly environment in which to learn." Section 16-6B-4 provides in part: "In addition to providing quality instruction in classrooms, all local boards of education must be fiscally accountable"; and § 16-6B-5 states in part: "In addition to providing quality instruction in classrooms and fiscal soundness, all local boards of education shall be accountable for compliance with statutes and regulations regarding school safety and discipline."
Based upon our examination of the record and the briefs, we conclude that the Board's motivation in contracting with Laidlaw for transportation services is not seriously questioned; the record indicates that the Board's decision was grounded in its desire to fulfill its statutory obligation to administer and supervise the city's school system, to the end that the children under its jurisdiction will receive the safest and most economical transportation in connection with school-related activities. The record, including Tom Dodd's affidavit, clearly indicates that the Board's decision to contract with Laidlaw was in the best interests of the children who attend public schools in the City of Tuscaloosa; and it is only for the supervision and education of those children that the school system exists. The sole issue presented for our consideration is whether the Board had the statutory authority to contract with Laidlaw. Given the broad grant of authority to a city school board in §§ 16-1-30, 16-11-2(a), 16-11-9, and 16-11-9.1, we must reverse the summary judgment for the plaintiffs unless the Board's authority to contract with an independent contractor for transportation services is restricted by other statutory provisions.
The plaintiffs contend that the Board's authority to contract is derived solely from the Legislature and that the Legislature has not specifically authorized city school boards to contract with independent contractors for transportation services. According to the plaintiffs, in the absence of a statutory provision specifically authorizing city school boards to contract with private companies like Laidlaw, such boards have no authority to delegate transportation responsibilities to a private company.
Laidlaw and the Board contend that §§ 16-1-30, 16-11-2(a), 16-11-9, and 16-11-9.1 confer authority on a city school board to enter into such contracts as the board deems necessary to promote the efficient management of its school system, unless such a contract denies a board employee a legal or constitutional right or an employment benefit to which he or she is legally entitled, or unless a board's right to contract is otherwise restricted by statute. We agree.
As noted above, §§ 16-1-30, 16-11-2(a), 16-11-9, and 16-11-9.1 confer broad authority on a city school board to take any action it deems necessary and proper for the efficient administration and management of its school system. Unless the authority conferred by §§ 16-1-30, 16-11-2(a), 16-11-9, and 16-11-9.1 is restricted by the second proviso in § 16-11-9.1, or by another statute, that broad authority provides sufficient legal underpinning for the Board's contract. See also Hughes v. Hartford Accident & Indem. Co., 223 Ala. 59, 134 So. 461 (1931); Salter v. Board of Educ. of Jefferson County, 229 Ala. 631, 159 So. 78 (1935); Scott v. Mattingly, 236 Ala. 254, 182 So. 24 (1938); Shores v. Elmore County Bd. of Educ., 241 Ala. 464, 3 So.2d 14 (1941); Hargett v. Franklin County Bd. of Educ., 374 So.2d 1352 (Ala. *879 1979); Madden v. Alabama State Tenure Comm'n, 508 So.2d 1178 (Ala.Civ.App. 1987), recognizing that local boards of education generally enjoy broad discretion in exercising legislative grants of authority to administer school systems.[3]
The plaintiffs also contend that the broad authority granted to the Board in §§ 16-1-30, 16-11-2(a), 16-11-9, and 16-11-9.1 is restricted by the second proviso in § 16-11-9.1, which states that the Board's authority to manage its school system "shall not be used to deny any employee any legal or constitutional rights to which he or she is entitled, nor shall such authority be used in such a way that employees are denied any benefits established *880 and required by law...." The plaintiffs argue specifically 1) that the contract violated § 16-25-5, which requires the enrollment of full-time public-education employees in the Teachers' Retirement System of Alabama; 2) that the contract violated certain provisions in Article 4 of the Merit System Act, specifically §§ 36-26-100 through -108 (also known as the Fair Dismissal Act), which provide dismissal procedures for full-time employees of local school boards, including bus drivers, who are not otherwise covered by the state merit system, the teacher-tenure law, or other state statute; and 3) that the contract violated § 16-25A-1 et seq., providing for public-education employees' health insurance under the Public Education Employees' Health Insurance Plan. The plaintiffs take the position that the contract violated the second proviso in § 16-11-9.1 because it allowed the Board to obtain bus drivers through an independent contractor and thereby to deny those drivers (employees of Laidlaw) benefits and rights under §§ 16-25-5, 36-26-100 through -108, and 16-25A-1 et seq.
Laidlaw and the Board contend that § 16-25-5, 36-26-100 through -108, and 16-25A-1 et seq. apply only to "employees" of the Board, not to Laidlaw's employees. They argue that the Board's employees retained all of their statutory benefits and rights and, therefore, that no Board employee was denied any legal or constitutional right or benefit, in violation of § 16-11-9.1, as the result of the Board's contract with Laidlaw. We agree with Laidlaw and the Board that §§ 16-25-5, 36-26-100 through -108, and 16-25A-1 et seq. do not apply to Laidlaw's employees.
Section 16-25-5(b) requires that "[a]ll janitors, maids, cafeteria workers and any other full-time employees in public education" be enrolled in the Teachers' Retirement System. Section 16-25-1(4) defines "support personnel or employee" as "[a]ny maid, custodian, adult bus driver, lunchroom, or cafeteria worker, secretary, clerk, clerical assistant, maintenance worker, or other non-certificated employee who works an average of 20 hours weekly." Section 16-25-1(5) defines an "employer" as "[t]he State of Alabama, the county school board, the city school board, the State Board of Education, or any governing body of any private nondenominational school operated nonprofit for education of children of school age residing within a district where no public school is available for the children or any other agency of and within the state by which a teacher is paid." As these definitions clearly indicate, § 16-25-5 does not apply to the employees of an independent contractor hired by the city school board.
Sections 36-26-100 through -108 provide dismissal procedures for certain full-time employees of local school boards, including adult bus drivers who work 20 or more hours each week during the school term. Section 36-26-100 defines "employees" to include, among others, "all persons employed by ... city boards of education." Sections 36-26-100 through -108 do not apply to the employees of an independent contractor hired by the city school board.
Section 16-25A-1 et seq. provide for health insurance for public-education employees. Section 16-25A-1(1) defines "employee" in part as "[a]ny person who is employed ... in any public institution of education within the State of Alabama." Section 16-25A-1(2) defines "retired employee" in part as "[a]ny person receiving a monthly benefit from the Teachers' Retirement System, who at the time of his retirement was employed by a public institution of education within the State of Alabama." These sections clearly indicate that § 16-25A-1 et seq. do not apply to the employees of an independent contractor.
Because §§ 16-25-5, 36-26-100 through -108, and 16-25A-1 et seq. do not apply to Laidlaw's employees, the Board, by contracting with Laidlaw, did not violate the second proviso in § 16-11-9.1 by denying one of its "employees" a legal or *881 constitutional right or benefits to which he or she was entitled by law.
The plaintiffs further contend that the Board's contract violated the Public Education Budget Acts of 1995, 1996, 1997, and 1998. All four of those acts provided that no funds allocated to the public schools could be used for the payment of any "salaries of personnel not under the direct control, employment, and supervision of local boards of education." The 1997 and 1998 Acts also included a proviso stating that the restriction on the use of funds for the public schools did not apply "to the construction, renovation, or major repair of buildings or other capital improvements which are beyond the capacity of regular employees to perform." Pointing to the proviso that the Legislature added to the 1997 and 1998 budget acts, the plaintiffs argue that the Legislature intended to prevent education funds from being paid to an independent contractor whose entire remuneration would come from its contract with a local school board. According to the plaintiffs, the 1997 and 1998 provisos were added to allow a local school board to contract with a construction company for a major construction or renovation project, when that contract might constitute the construction company's sole source of income by which it could pay its employees' salaries. The plaintiffs state in their brief:
"This proviso also shows that Plaintiffs have correctly interpreted the word `salaries' to mean a worker's complete annual remuneration, rather than just some portion of a worker's wages that would be attributable to a contract for individual or occasional services. It is clear that a contract for a limited service (e.g., a plumbing repair) would not involve the complete payment of any worker's `salary' in violation of the Public Education Budget Acts. However, it is possible that a contract for some major project, such as the construction or renovation of a building, could result in some contract employees working full-time on the project for a complete year or more, thereby receiving their entire `salaries' from that individual contract. Therefore, the legislature added the proviso to exempt such contracts from the prohibition. This makes clear that the provision as a whole does prohibit the expenditure of the appropriated funds on contracts that provide for the complete salaries of full-time support staff who are `directly employed' by independent contractors."
Laidlaw and the Board contend that there is no evidence to support the trial court's statement in its order "that by arranging to pay the entire salaries of ... bus drivers through [a] contract[] with [an] independent contractor[], the local [school board has] violated these provisions." They argue further that if the plaintiffs' interpretation of legislative intent is correct, then:
"[A]ny payment to an independent contractor or like provider of services to a board of education would be `tainted' by the presumption that some portion of the fee or payment made to the independent contractor would be allocable to the contractor's overhead, and by the further presumption that payment of salaries is an element of that overhead. Such reasoning would prohibit the application of any appropriated education funds to the payment of virtually any independent contractor. If payments used indirectly or in some remote sense to pay salaries are made illegal by the appropriations acts in question, then all contracts for services of any kind between school boards and outside entities are illegal under Alabama law. Such a construction cannot be reconciled with other provisions of Alabama law or with any notion of sound public policy."
(Emphasis in original.)
After examining the record, we conclude that the Board's contract with Laidlaw, insofar as it called for the payment of a set fee for transportation services, did not violate the budget acts. In DeKalb County *882 LP Gas Co. v. Suburban Gas, Inc., 729 So.2d 270, 275-76 (Ala.1998), this Court stated:
"In determining the meaning of a statute, this Court looks to the plain meaning of the words as written by the legislature. As we have said:
"`"Words used in a statute must be given their natural, plain, ordinary, and commonly understood meaning, and where plain language is used a court is bound to interpret that language to mean exactly what it says. If the language of the statute is unambiguous, then there is no room for judicial construction and the clearly expressed intent of the legislature must be given effect."'
"Blue Cross & Blue Shield v. Nielsen, 714 So.2d 293, 296 (Ala.1998) (quoting IMED Corp. v. Systems Eng'g Assocs. Corp., 602 So.2d 344, 346 (Ala.1992)); see also Tuscaloosa County Comm'n v. Deputy Sheriffs' Ass'n, 589 So.2d 687, 689 (Ala.1991); Coastal States Gas Transmission Co. v. Alabama Pub. Serv. Comm'n, 524 So.2d 357, 360 (Ala. 1988); Alabama Farm Bureau Mut. Cas. Ins. Co. v. City of Hartselle, 460 So.2d 1219, 1223 (Ala.1984); Dumas Bros. Mfg. Co. v. Southern Guar. Ins. Co., 431 So.2d 534, 536 (Ala.1983); Town of Loxley v. Rosinton Water, Sewer, & Fire Protection Auth., Inc., 376 So.2d 705, 708 (Ala.1979). It is true that when looking at a statute we might sometimes think that the ramifications of the words are inefficient or unusual. However, it is our job to say what the law is, not to say what it should be. Therefore, only if there is no rational way to interpret the words as stated will we look beyond those words to determine legislative intent. To apply a different policy would turn this Court into a legislative body, and doing that, of course, would be utterly inconsistent with the doctrine of separation of powers. See Ex parte T.B., 698 So.2d 127, 130 (Ala.1997)."
The plain wording of the budget acts prohibits a local school board from paying the salaries of personnel under the direct control, employment, and supervision of another. The record does not indicate that the Board's contract with Laidlaw requires the Board to pay the salaries of Laidlaw's employees. The contract does require the Board to pay a set fee for certain transportation services provided by Laidlaw to the Board, and it can be assumed, we think, that Laidlaw pays its employees' salaries from revenue generated by its various transportation contracts, including its contract with the Board. We agree with Laidlaw and the Board that the plain meaning of the language used in the budget acts cannot be ignored, especially when to do so by accepting the interpretation suggested by the plaintiffs would lead to a facially absurd resultthe inability of a local school board to contract with any independent contractor for goods or services because some portion of the contract payments to that independent contractor presumably would be used to pay the independent contractor's expenses, including the salaries of the contractor's employees. The Legislature could not have intended such a result.
At this juncture, we note the plaintiffs' reliance on § 5 of the Guaranteed Energy Cost Savings Act (Act No. 98-663, Ala. Acts 1998), which became effective on May 6, 1998, as indicating legislative intent. That section, codified at § 41-16-144, Ala. Code 1975, provides:
"The provisions of this act shall not be construed to alter or circumvent present law which requires education support personnel to work under the direct supervision, employment, and/or control of local boards of education."
(Emphasis added.) That language is different from that used in the budget acts at issue. The budget acts prohibit a local school board from paying the salaries of personnel under the direct control, employment, and supervision of another. The section quoted above purports to reaffirm *883 "present law," but then characterizes that law as requiring all education support personnel to work under the "direct supervision, employment, and/or control" of local school boards. The Legislature knows how to change the law when it is inclined to do so. The proscription in the budget acts on the payment of salaries of personnel under the control, employment, and supervision of another is clear. We do not view the language of the Guaranteed Energy Cost Savings Act as constituting an amendment of the budget acts. To the contrary, it appears to be an incorrect characterization of "present law."
Likewise, we note the plaintiffs' reliance on Joint Resolution 99-94, which was approved by the Governor on April 22, 1999. That resolution reads in pertinent part:
"WHEREAS, local boards of education are prohibited from using state funds for the payment of any persons not under the local board of education's direct control, employment, and supervision (Act 98-504); and
". . . .
"WHEREAS, local boards of education are authorized and required to manage, control, and operate all aspects of services provided in their respective schools (Code of Alabama §§ 16-8-9, 16-11-2, 16-12-1, and 16-12-16); and
". . . .
"BE IT FURTHER RESOLVED, That the Legislature reaffirms its intent that no employee of any entity, public or private, who daily performs work in our state's K-12 public schools may be denied full coverage of the benefits and privileges described herein.
"BE IT FURTHER RESOLVED, That the Legislature reaffirms its intent that all employees in public education who come into daily contact with our state's children must be under the direct employment, supervision, and control of the local board of education.
"BE IT FURTHER RESOLVED, That the Legislature of Alabama expresses its appreciation to the employees of our local public schools and each local board of education be furnished a copy of this resolution as a reminder of its responsibility for direct management and control of its programs and personnel."
A resolution such as this one is not a law; it is merely the form in which the Legislature expresses an opinion. The Legislature has no power to make or change law by resolution. Art. IV, § 61, Ala. Constitution ("No law shall be passed except by bill...."); Gunter v. Beasley, 414 So.2d 41 (Ala.1982). Whatever the Legislature may have intended by Resolution 99-94 is irrelevant to our resolution of the issues presented on this appeal. The controlling law here is that expressed in the applicable budget acts. See Opinion of the Justices No. 275, 396 So.2d 81 (Ala. 1981); Opinion of the Justices No. 265, 381 So.2d 183 (Ala.1980) (a statute cannot be amended by a joint resolution of the Legislature).
Based on the above, we conclude that the Board's contract did not violate the applicable budget acts by requiring the Board to pay a fee for Laidlaw's services. We also conclude that the contract did not violate § 16-11-9.1 by allowing Laidlaw employees to provide transportation services to the Board even though they are not allowed to participate in the Teachers' Retirement System, to receive health-insurance benefits under the Public Education Employees' Health Insurance Plan, or to be subject to the due-process procedures of the Fair Dismissal Act. However, our examination of this case has revealed a critical problem that none of the parties has sufficiently addressed. The budget acts clearly state that a local school board shall not pay the salaries of personnel not under its "direct control, employment, and supervision." From our examination of the record, we conclude that there appears to be no question that a number of the Board's employees, whose salaries are being paid by the Board, are under the direct *884 control and daily supervision of Laidlaw. The Board has no statutory authority to pay its own employees from funds allocated by the Legislature as long as they are under the direct control and supervision of Laidlaw. Consequently, the Board's contract did violate the budget acts insofar as it placed the Board's own employees under the direct control and supervision of Laid-law. The Board's inability to pay its employees from legislatively allocated funds, in turn, causes the contract to violate the second proviso in § 16-11-9.1, which prohibited the Board from exercising its authority to contract if to do so would deny its employees legal rights or benefits. We can think of no more important right or benefit belonging to a Board employee than to be paid for services rendered to the Board under his or her employment contract. Likewise, the inability of the Board to pay its employees would constitute a de facto termination of their employment without following the procedures of the Fair Dismissal Act. For this reason, we must affirm the trial court's judgment.[4]
1982234AFFIRMED.
1982235AFFIRMED.
HOOPER, C.J., and MADDOX, SEE, LYONS, and BROWN, JJ., concur
ENGLAND, J., concurs in the result.
JOHNSTONE, J., concurs in the result and in the rationale in part.
JOHNSTONE, Justice (concurring in the result and in the rationale in part).
I concur in the holding that the Laidlaw contract is illegal because it illegally authorizes Laidlaw to exercise direct supervision and control over certain local school board employees. I express no opinion on the other aspects of the rationale of the main opinion.
NOTES
[1] The Alabama Education Association represents employees of school systems throughout the state; its membership includes school-bus drivers and other transportation-related support personnel. The Professional Educators of Tuscaloosa Association also has members who are school-bus drivers in the Tuscaloosa City School System. Prewitt and Willis are school-bus drivers and are members of both associations.
[2] The record indicates that as of the date of its contract with the Board, Laidlaw was providing transportation services for the Florence and Huntsville City School Systems and was providing transportation services for special-needs students in the Birmingham City School System.
[3] We note that Chapter 27 ("Transportation of Pupils") of Title 16 ("Education") contains several provisions that strongly indicate the Legislature has sanctioned private transportation contracts with local school boards. Section 16-27-1 provides:

"The State Board of Education shall prescribe rules and regulations:
"(1) Requiring all local boards of education which provide transportation services for pupils going to and from public elementary and secondary schools of Alabama or in school-related activities, and the presidents of all state community, junior and technical colleges and directors of all state technical institutes and trade schools which provide transportation services for pupils going to and from said technical institutes and trade schools or community, junior and technical colleges to employ a competent supervisor or manager of such transportation services, whether such transportation services are provided in publicly owned or privately owned buses;
"(2) Requiring periodic safety inspection of all vehicles used for transporting pupils, whether such vehicles are publicly or privately owned;
"(3) Requiring and providing for special training and licensing of drivers of all vehicles used to transport pupils to and from school and in all school-related activities, whether such vehicles are publicly owned and operated or operated under contract with a private owner."
(Emphasis added.) Section 16-27-5 states:
"All local boards of education, all presidents of state community, junior and technical colleges and all directors of state technical institutes and trade schools which provide transportation services for pupils or students going to and from public elementary and secondary schools, community, junior and technical colleges or technical institutes and trade schools, and in school or college related activities shall have safety inspections made of all vehicles used for such transportation at least once each month, whether such vehicles are publicly owned and operated or privately owned and operated under contract between the board of education, board of trustees or other governing body of a community, junior and technical college and the owner of [the] vehicle."
(Emphasis added.) Section 16-27-6(c) provides:
"Every contract between a board of education and a school bus contract operator shall contain a clause requiring the driver of a school bus to wear a properly fastened seat belt when the bus is being used for the transporting of pupils on a public street or highway or elsewhere. Failure of any driver to comply with this requirement shall constitute a breach of contract on the part of the contract operator."
(Emphasis added.)
Also, in establishing the jurisdictional reach of the Public Service Commission, the Legislature exempted from the Alabama Motor Carrier Act "[s]chool buses or other motor vehicles which are owned by county boards of education or under contract with county boards of education, regardless of whether or not the school buses and other motor vehicles are being used exclusively for the transportation of school children and school teachers to and from school and provided the school buses and other motor vehicles do not take on passengers for fare on a certificated route." See § 37-3-4(a)(1)a. (Emphasis added.) See also Chapter XXX-XXX-XXX.12(18) of the Rules of the Alabama State Department of Education ("Transportation for Students with Disabilities"), Alabama Administrative Code, which states in part:
"(a) Special transportation, if required by the individualized education program, must be provided for students with disabilities.
"(b) Special transportation includes travel to and from school and between schools, travel in and around school buildings, modified vehicles, additional personnel assigned to vehicles to ensure safety of the students with disabilities, or purchased services involving parents or companies who use or subcontract fleet vehicles.
". . . .
"(f) One copy of each special transportation contract must be on file with the education agency and the state Department of Education, Division of Administrative and Financial Services."
[4] We do not address the question whether the Board has the authority under the "good and just causes" provision of § 36-26-102 to terminate the employment of bus drivers and other transportation-related support personnel employed by the Board, or the question whether such action on the Board's part would violate the second proviso in § 16-11-9.1. We note, however, that in Ellenburg v. Hartselle City Board of Education, 349 So.2d 605, 609-10 (Ala.Civ.App.1977), the Court of Civil Appeals quoted, with approval, 68 Am. Jur.2d Schools § 183 (1973):

"`"[G]ood cause" in a statute of this kind [Tenure Act] is by no means limited to some form of inefficiency or misconduct on the part of the teacher dismissed, but includes any ground put forward by a school committee in good faith and which is not arbitrary, irrational, unreasonable, or irrelevant to the committee's task of building up and maintaining an efficient school system. Limited only by the statutory provision that they must be good and just causes, the jurisdiction and discretion to determine what these causes may be rests in the hands of the school authorities.'"
This Court quoted that same statement with approval in Ex parte Alabama State Tenure Commission, 555 So.2d 1071, 1074 (Ala. 1989).